**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| **L-3 NATIONAL SECURITY SOLUTIONS, INC.,** | ) | |
| **AS SUCCESSOR TO L-3 SERVICES, INC.,** | ) | |
| **GLOBAL SECURITY & ENGINEERING** | ) | |
| **SOLUTIONS DIVISION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:12-cv-59** |
| | ) | |
| **INNOVATIVE WIRELESS  TECHNOLOGIES, INC.,** | ) | |
| **ERIC HANSEN, PHILIP CARRIER,** | ) | |
| **PAUL SCHMIDT, JOHN STECKLEY,** | ) | |
| **ROD PASSMORE, DARREN KREEGER,** | ) | |
| **JASON JARRETT, LOGI-TEC, INC.** | ) | |
| **and BOOKCLIFF SALES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### IWT DEFENDANTS' MEMORANDUM IN SUPPORT OF
### THEIR RULE 12(b)(1) AND 12(b)(6) MOTION TO DISMISS

Innovative Wireless Technologies, Inc. ("IWT") and its employees Eric Hansen ("Hansen"), Philip Carrier ("Carrier"), Paul Schmidt ("Schmidt"), John Steckley ("Steckley"), Rod Passmore ("Passmore"), Darren Kreeger ("Kreeger"), and Jason Jarrett ("Jarrett"), ("Individual Defendants"), (collectively, "IWT Defendants") by counsel, file their Memorandum in Support of their Rule 12(b)(1) and 12(b)(6) Motion to Dismiss Plaintiff's Complaint.

### BACKGROUND

IWT is a wireless solutions company and a leading supplier of wireless mesh radios, integrated systems, wireless mesh networks and wireless design engineering services since 1997.

On January 2, 2006, the Sago coal mine in Sago, West Virginia exploded and collapsed trapping thirteen miners.  *See* Compl. at ¶ 16.  During the incident, rescue personnel were unable to effectively track or communicate with the trapped miners and twelve of them perished.  *See id.*

Following the Sago disaster, IWT began researching and assessing whether its preexisting wireless mesh technology could be deployed in the underground mining market. In or around March 2006, IWT coordinated with the U.S. Mine Safety and Health Administration ("MSHA") to demonstrate its preexisting wireless mesh technology at the McElory coal mine in Moundsville, West Virginia. On or about April 10-11, 2006, IWT demonstrated its preexisting communications, proximity detection and location capabilities to MSHA.

On or about October 18, 2006, the Virginia Department of Mines, Minerals and Energy ("DMME") held a conference at the Virginia Military Institute ("DMME Conference"). During this conference, IWT representatives met representatives of SYColeman Corporation ("SYColeman"), a predecessor of Plaintiff. This was the first substantive discussion between IWT and SYColeman or any other predecessor or affiliate of Plaintiff in connection with underground mining. During the DMME conference, IWT introduced SYColeman to Poytt-Boone Electronics, Inc. ("PBE") and Alion Science and Technology Corp. ("Alion").

Prior to the DMME Conference, IWT had developed, marketed, sold and owned the following preexisting wireless mesh technology: (1) IWT's mProv™ wireless mesh management software; (2) IWT's mPros™ wireless mesh network software/firmware; (3) IWT's wireless mesh network programming script; (4) IWT's gateway node hardware designs including embedded software/firmware; and (5) IWT's hardware and software designs upon which its handset and fixed mesh node mesh interface designs were based.

## PLAINTIFF'S FACTUAL ALLEGATIONS

### Solicitation

On or about November 17, 2006, the Centers for Disease Control and Prevention ("CDC") issued a solicitation "to design, adapt, construct, install, and evaluate wireless mesh

'peer-to-peer' prototype communication networks in an under ground coal mine," Solicitation No. 2007-N-09181 ("Solicitation").   *See* Solicitation at § (C)(I)[1]; Compl. at ¶ 22.   The Solicitation proposed a three (3) phase contract: "Phase I - System Design"; "Phase II – Demonstration of prototype system (Experimental Mine)"; and "Phase III – Demonstration of prototype system (Operational Mine)." *Id.* at § (C)(III).

## Teaming Agreement

On or about January 11, 2007, IWT and SYColeman entered into a Teaming Agreement to compete for the Solicitation ("Teaming Agreement"), a copy of which is attached hereto as **Exhibit 1**. (*See* Compl. at ¶¶ 24-25 (explicitly referencing the Teaming Agreement)).   Under the terms of the Teaming Agreement, SYColeman and IWT would both work to prepare a winning proposal for the Solicitation ("NIOSH Proposal"). *See, e.g.,* Ex. 1 at § 1.1.

Because the Solicitation incorporated Federal Acquisition Regulation ("FAR") Clause 52.203-6 (which prohibits contractors from restricting subcontractor competition with government sales), the "Noncompetition" provision in the Teaming Agreement was extremely limited and prohibited both parties from "compet[ing] independently (including the independent submission of a proposal to the Government) **for work specified in [the Teaming Agreement]**." *See* Ex. 1 at § 14 (emphasis added).   It did not, however, prohibit commercial competition or competition for other government bids. *See id.* ("The Agreement shall not preclude either party from participating in or contracting individually on any Government or industry program, nor from offering its services as normally provided through catalog, schedule or other vehicles, which may arise in the general area of business related to the proposal which will be prepared").   Moreover, the non-compete provision was expressly limited to the "effective

---

[1] Available at http://www.cdc.gov/niosh/mining/mineract/pdfs/2007-N-09181WirelessMeshRFP.pdf

term of the [Teaming Agreement]." *Id.* The "Term of the Agreement" was defined as the date of execution until the earliest of numerous contingencies, including: (1) "The finalization and execution of a Subcontract between Contractor and Subcontractor"; or (2) "The date is two years from the date this Agreement was executed." *Id.* at § 3.1(g), (j).

Significantly, the Teaming Agreement also outlined the parties' understanding of their respective intellectual property rights in their preexisting and jointly developed intellectual property.[2] Section 9.1 addressed title to intellectual property and provided, in pertinent part:

A.   ***Neither party shall acquire*, directly or by implication *any rights in any copyrighted works, patents, inventions and/or Proprietary Information [defined herein] of the other party*** developed, authored, conceived or reduced to practice ***prior to the date of this Agreement***, including but not limited to, inventions . . . filed prior to the date of this Agreement.

B.   To the extent that any works that are subject to protection as Intellectual Property, including but not limited to copyright, patent, trademark or trade secret protection, and are **developed under this Agreement jointly by both parties, each party shall gain and possess an *equal ownership share* in those works** and shall negotiate final ownership rights through a separate written agreement.

Both parties performed under the Teaming Agreement and ultimately submitted the NIOSH Proposal to CDC/NIOSH.

### First Joint Development Agreement

Following the execution of the Teaming Agreement and submission of the NIOSH Proposal, CDC/NIOSH announced that SYColeman, IWT, Alion and PBE (the "Team") had submitted the winning proposal. (*See* Compl. at ¶ 26). During budget negotiations with NIOSH,

---

[2] The FAR provisions also restricted SYColeman's and its successors' ability to obtain rights to IWT's preexisting intellectual property. *See* 48 C.F.R. § 52.227-11 ("The Contractor shall not, as part of the consideration for awarding the subcontract, obtain rights in the subcontractor's subject inventions"); *cf.* 48 CFR 27.304-3 ("It is Government policy that contractors shall not use their ability to award subcontracts as economic leverage to acquire rights for themselves in inventions resulting from subcontracts")

the Team learned that it needed to reduce its proposed budget for the NIOSH Contract by approximately $400,000. (*See infra.* Ex. 2 at § 2.01 and Ex. A (recognizing the intent of the First JDA was to reduce the "CDC/NIOSH wireless mine cost proposal and . . . mak[e] progress towards obtaining MSHA certification of mesh hardware")).

To accomplish this task, on May 21, 2007, SYColeman and IWT entered into the Joint Development Agreement SYC-TS2-07-IRAD001 (the "First JDA"), a copy of which is attached hereto as **Exhibit 2**. (*See* Compl. at ¶¶ 27-29 (explicitly referencing the First JDA)).  Under the terms of the First JDA, SYColeman and IWT each agreed to make up the NIOSH budget shortfall by contributing their own funds or resources.  *See* Ex. 2 at § 2.01 (recognizing that SYColeman would fund $250,000 and IWT would contribute resources valued at $150,000).

Under the terms of the First JDA, the period of performance was originally defined as May 21, 2007 to October 31, 2007.  Ex. 2 at § 2.04(a).  The First JDA, however, was amended on or about August 9, 2007, and again on or about March 18, 2008—copies of the amendments to the First JDA are attached hereto as **Exhibit 3**.  The second and final amendment to the First JDA extended the period of performance from May 21, 2007 through April 16, 2008, and substituted Global Security & Engineering Services ("GS&ES") for SYColeman as the contracting party.

Pursuant to the First JDA and the accepted NIOSH Proposal, IWT adapted its preexisting wireless mesh communications system to underground coal mining applications.  *See, e.g.*, Ex. 2 at 1 ("This joint project will result in a variant of IWT's existing mesh communications system suitable for underground coal mining applications").

As with the Teaming Agreement, the First JDA recognized that IWT owned all rights, title and interest in its preexisting intellectual property, or so called "Background Intellectual

Property" ("BIP"), and the First JDA in no way conveyed any interest in IWT's BIP to SYColeman or GS&ES—even the right to license IWT's BIP was expressly carved out.  *See, e.g.*, Ex. 2 at § 3 (defining BIP); Ex. 2 at § 3.01(b) (stating "No term or provision hereof will including licensing considerations for BIP, as such, terms and conditions for BIP utilization will be negotiated and addressed in a separate Agreement).

The First JDA further contemplated that specific intellectual property would be created pursuant to its terms, so called "Foreground Intellectual Property" ("FIP").  *See, e.g., id.*; Ex. 2 at § 1.  Because ownership of intellectual property was a primary concern, the First JDA expressly delineated the exact software and hardware that would be considered FIP.  Ex. 2 at Ex. B and Ex. 3 at Ex. B (setting forth the software modules and hardware that were considered to be FIP); *see also* Ex. 2 at § 1 (defining FIP by reference to Exhibit B).  The First JDA further provided that "[u]pon completion, IWT and [GS&ES] will **jointly own** and **each collectively retain, full right, title and interest in all developed FIP** [as defined herein]."  Ex. 2 at § 3.01(a); *See also* Ex. 2 at § 3.  Section 3.01(d) of the First JDA purported to impose a restrictive covenant on IWT:

> Each party shall retain the right to use . . . FIP for any future applications, products or purposes in any Field of Use except for underground coal mining applications whereby [GS&ES] will retain exclusive rights to [use] the [FIP].  Additionally, IWT will not prepare competing technology to the expressed application for sale within the expressed Field of Use.

Section 3.01(e), however, provided that "No provision of this Agreement shall restrict either party's ability to conduct further research and development in the area of FIP or any other areas."

### Subcontract

On or about May 25, 2007, shortly after the First JDA was executed, SYColeman entered into the prime contract contemplated by the Solicitation and NIOSH Proposal.  (*See* Compl. at ¶ 30).  On or about October 18, 2007, SYColeman and IWT entered into the subcontract

contemplated by the Teaming Agreement ("Subcontract"), a copy of which is attached hereto as **Exhibit 4**. (*See id.* at ¶ 31 (expressly referencing the Subcontract)).

Pursuant to the Solicitation and prime contract, the Subcontract set forth the same three (3) phase contract: "Phase I - System Design"; "Phase II – Demonstration of prototype system"; and "Phase III – Demonstration of prototype system." Ex. 4 at § (C)(III). Again, the overarching purpose and stated need for the Subcontract was to "avoid accidents, provide immediate communication of incidents to MSHA and dispatchers, and provide assistance to mine rescuers in saving lives." *Id.* at § (C)(II). Like the Teaming Agreement, the Subcontract—as it must—incorporated the FAR clauses set forth in the Solicitation and prime contract.

**Second Joint Development Agreement**

Between phase two and three of the Subcontract, another budget shortfall was identified, and the government also released new standards that imposed greater restrictions than those originally anticipated. Because sufficient funds were not available to address these concerns, IWT and GS&ES entered into a Second Joint Development Agreement No. TS2-08-IRAD001 (the "Second JDA") on May 12, 2008, a copy of which is attached hereto as **Exhibit 5**. Under the terms of the Second JDA, GS&ES and IWT each agreed to make up the NIOSH budget shortfall by contributing their own funds or resources. *See* Ex. 5 at § 2.01 (recognizing that SYColeman would fund $250,000 and IWT would contribute resources valued at $250,000).

Under the terms of the Second JDA, the period of performance was originally defined as May 12, 2008 to November 30, 2008. Ex. 5 at § 2.04(a). The Second JDA, however, was amended on or about December 12, 2008, and the performance period was extended until February 28, 2009—a copy of the amendment to the Second JDA is attached hereto as **Exhibit 6**.

As with the prior agreements, the Second JDA again recognized that IWT owned all rights, title and interest in its BIP, and the contract made no attempt to convey any interest therein to GS&ES.  *See, e.g.*, Ex. 2 at § 3 (defining BIP); Ex. 2 at § 3.01(b) (stating "No term or provision hereof will including licensing considerations for BIP, as such, terms and conditions for BIP utilization will be negotiated and addressed in a separate Agreement).

Although FIP was discussed in the Second JDA, very little, if any, new FIP was contemplated or created.  Accordingly, no Exhibit B was ever created for the Second JDA.  *See* Ex. 5 at § 1 (defining FIP by reference to the nonexistent Exhibit B).  In any event, the Second JDA, like the first, provided:   "Upon completion, IWT and GS&ES will **jointly own** and **each collectively retain, full right, title and interest in all developed FIP**."  Ex. 5 at § 3.01; *See also* Ex. 5 at § 3.  The Second JDA also revised, replaced and amended the purported restrictive covenant in the First JDA, and stated as follows:

> Each party shall retain the right to use . . . FIP for any future applications, products or purposes in any Field of Use except for underground coal mining applications [~~whereby [GS&ES] will retain exclusive rights to [use] the [FIP]~~].[3]   Additionally, IWT will not prepare competing technology to the expressed application for sale within the expressed Field of Use.

Ex. 5 at § 3.01(d).  Section 3.01(e), however, remained the same and provided that "No provision of this Agreement shall restrict either party's ability to conduct further research and development in the area of FIP or any other areas."

### Subcontract Closeout

As evidenced by the Contract Close Out letter sent from GS&ES to IWT on December 22, 2009, a copy of which is attached hereto as **Exhibit 7**, the Subcontract—which was the blanket agreement between the parties—was completed on or before April 7, 2009, and IWT sent

---

[3]   The strike-through text does not appear in the Second JDA, but is included herein to demonstrate the portion omitted from the Second JDA.

its final invoice to GS&ES on or about April 7, 2009.  Ex. 7 at 1 (stating "According to our records, the subject subcontract [TS2-07-CDCWM-002] has been completed").

### Service Support Agreement

On or about August 10, 2010, GS&ES and IWT entered into a Service Support Agreement ("Service Support Agreement"), a copy of which is attached hereto as **Exhibit 8**. (*See* Compl. at ¶ 40 (explicitly referring to the Service Support Agreement)).  The purpose of the Service Support Agreement was to "enter into an installation agreement for purposes of executing installation necessary for delivery and acceptance of the [wireless mesh system]."  Ex. 8 at 2.  The Service Support Agreement, however, was at-will and expressly provided that it "neither authorized [IWT] to provide nor commit[ed] [GS&ES] to order any quantity or dollar amount of work or services."  *Id.* at § 2.2.  Contrary to Plaintiff's allegation, the Service Support Agreement did not include any term or provision related to non-solicitation of GS&ES's customers by IWT.  Compl. at ¶ 40; *see generally* Ex. 8.

### ARGUMENT & AUTHORITIES

### I.    Count I (Lanham Act Violations) Must Be Dismissed

Plaintiff purports to assert a claim for reverse passing off and/or false advertising under Section 43(a) of the Lanham Act. Plaintiff's claim, however, fails as a matter of law because:  (1) IWT was, in fact, the source and origin of the goods; (2) IWT is the exclusive owner of certain goods and joint owner of any remaining goods; (3) Plaintiff fails to allege any act of "false designation of goods;" (4) Plaintiff fails to allege any false statement or misrepresentation in commercial advertising; and (5) Plaintiff fails to allege that IWT engaged in commercial speech.

In any event, Plaintiff is impermissibly attempting to use the Lanham Act to resolve an alleged contract dispute.  Section 43(a) "does not have boundless application as a remedy for

unfair trade practices." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003).  "[B]ecause of its inherently limited wording, § 43(a) can never be a federal 'codification' of the overall law of 'unfair competition,' but can apply only to certain unfair trade practices prohibited by its text."  *Id.*

A.    **Plaintiff's Complaint Fails To State A Claim for Reverse Passing Off**

The Lanham Act prohibits a "false designation of origin" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association ... or as to the origin" of "goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(A).  This provision of the Lanham Act is directed at preventing two types of conduct:  "passing off" and "reverse passing off."[4] *Dastar Corp.*, 539 U.S. at 28.  To state a claim for reverse passing off, a plaintiff must allege and prove: "(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin." *Universal Furniture Intern., Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 438 (4th Cir. 2010).  The phrase "origin of goods," as used in Section 43(a), "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Dastar Corp.*, 539 U.S. at 37.

(1)    **Plaintiff Cannot State A Claim For Reverse Passing Off Because The Goods At Issue Originated From IWT And IWT Is The Owner of The Goods**

Plaintiff cannot state a claim for reverse passing off because IWT was the producer of the handsets, fixed mesh nodes and gateway nodes in the ACCOLADE system that are alleged to

---

[4] "'Passing off' (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's. 'Reverse passing off,' as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own." *Dastar Corp.*, 539 U.S. at 28 n.1.

have been passed off.  *See generally* Exs. 2-6 (recognizing that IWT created, developed and produced the handset, fixed mesh nodes and gateway nodes in the ACCOLADE system by adapting IWT's preexisting mesh communication system for use in coal mines).  Moreover, IWT is the owner—either exclusively or jointly—of all of those products.  *See, e.g.,* Exs. 2, 5 at § 3.01 (a)-(c) (recognizing that IWT exclusively owns all right, title and interest to its preexisting intellectual property in the handsets, fixed mesh nodes, and gateway nodes used in the ACCOLADE system, and "IWT and [GS&ES] . . . jointly own and **each collectively retain, full right, title and interest in all developed [intellectual property]**" used in the ACCOLADE system); *see also id* at § 3.01 (c) ("[IWT and GS&ES] shall be entitled to establish all proprietary rights for itself in the intellectual property represented by derivatives") (emphasis added).

There is no claim for passing off your own product as exactly that—your own product. *See Dastar Corp.*, 539 U.S. at 28 n.1 ("'Passing off' . . . occurs when a producer misrepresents his own goods or services as someone else's. 'Reverse passing off,' as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own").

Aside from the ownership issue—which itself is dispositive—Plaintiff cannot state a claim for reverse passing off because all of the alleged competing products originated from IWT. In its Complaint, Plaintiff concedes that **IWT developed** the "competing handset" and "competing nodes." *See, e.g.*, Compl. at ¶ 41 ("IWT . . . presented L-3 with a prototype of a new handset . . . as an alternative to the ACCOLADE system's handset"); *Id.* at ¶ 43 (customer believed that "IWT['s] handset was part of the ACCOLADE system); *Id.* at ¶ 51 ("One L-3 customer exclaimed:  'this **IWT handset** works with the L-3 system,' or words to that effect"); *Id.* at ¶ 56 ("IWT has misled L-3's current and potential customers that [IWT's] competing nodes are part of the ACCOLADE system").  Accordingly, Plaintiff fails to state a claim for reverse

passing off because IWT's "competing" handset and nodes, were, in fact, developed and produced by IWT.  IWT, therefore, was the "origin of the goods" within the meaning of Section 43(a) of the Lanham Act.  *See Dastar Corp.*, 539 U.S. at 37 ("Origin of goods" . . . "refers to the **producer of the tangible goods** that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods").  Plaintiff, therefore, fails to satisfy its *prima facie* case for reverse passing off because Plaintiff cannot establish that the goods originated with Plaintiff.

### (2)   Plaintiff Fails to Allege Any False Designation of Goods

In any event, Plaintiff fails to allege false designation of the handset, fixed mesh nodes and gateway nodes.  Plaintiff's purported reversing passing off claim is, by necessity, vague, unspecified and without any factual allegation of "false designation."

Plaintiff alleges only that "customers were confused," but Plaintiff fails to allege that customers were confused by any act of "false designation" by IWT.  *See, e.g.,* Compl. at ¶ 43 (failing to allege false designation, but stating "L-3's customers . . . contacted L-3's sales staff about what the customer believed was L-3's new handset"); *Id.*. at ¶ 47 ("Other customers . . . have informed L-3 that they have seen alternative handsets at their mines, and have been confused"); *Id.* at ¶ 51 ("One L-3 customer exclaimed:  'this **IWT handset** works with the L-3 system,' or words to that effect").  Although consumer confusion is one element of a passing off claim, that confusion must be caused by a false designation—which Plaintiff fails to allege.

Plaintiff, of course, cannot allege false designation because IWT was and is the owner and origin of the handsets, fixed mesh nodes and gateway nodes in both the ACCOLADE system and IWT's SENTINEL system.  Nonetheless, Plaintiff's Complaint is facially deficient because

Plaintiff did not and cannot allege any act of false designation by IWT.  Accordingly, Plaintiff's passing off claim must be dismissed as wholly insufficient, if not entirely frivolous.

> **B.**     **Plaintiff's Complaint Fails To State A Claim for False Advertising**

The Lanham Act also prohibits "a false or misleading description of fact, or false or misleading representation of fact" . . . "in commercial advertising or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).  To assert a false advertising claim, plaintiff must allege and prove: "(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 272 (4th Cir. 2002).

> **(1)**     **Plaintiff Has Failed to Allege Any False or Misleading Advertisements**

Plaintiff fails to allege that IWT disseminated any false or misleading advertisements or promotions.  In fact, in Paragraph 51 of the Complaint, Plaintiff merely alleges that IWT advertised its competing "SENTINEL" system without any allegation that this advertisement contained false or misleading information regarding Plaintiff.

In Paragraphs 44 and 50, Plaintiff claims that IWT "surreptitiously signed into [trade] show[s] as L-3 employees."  Although these allegations are completely false, even when accepted as true for purposes of this Motion to Dismiss, there is no allegation that IWT offered

any goods or services at the trade shows or otherwise misrepresented the nature, characteristics or qualities of Plaintiff's goods or services while at these trade shows.   To assert a claim for false advertising, Plaintiff must allege a misrepresentation of the nature, characteristics or qualities of Plaintiff's goods or services, and Plaintiff has failed to do so.  *See* 15 U.S.C. § 1125(a)(1)(B); *See also Marcinkowska v. IMG Worldwide, Inc.*, 342 Fed.Appx. 632 at **4 (Fed Cir. 2009) (relying on Fourth Circuit precedent to affirm Rule 12(b)(6) dismissal of Lanham Act claim which "was not based on false advertising in connection with any name, description, or origin of [plaintiff's] goods or services"); *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, (9th Cir. 2007) (explaining that "§ 1125(a)(1)(B) creates liability only for *product* disparagement—i.e., misrepresentation of 'the nature, characteristics, qualities, or geographic origin' of 'another person's *goods, services, or commercial activities*.'   [Plaintiff] does not allege or show that [defendant] made any statements disparaging its goods or services").

### (2)    Plaintiff Has Failed to Allege Commercial Speech

Even if Plaintiff could allege that every instance of customer confusion asserted in its Complaint resulted from some false or misleading statement of the nature, characteristics, quality or origin of Plaintiff's goods or services—which it cannot—Plaintiff's false advertising claim would fail because such limited actions could not constitute "commercial advertising or promotions" within the meaning of the Lanham Act.

To prove that a statement was made "in commercial advertising or promotion," within the meaning of the Lanham Act, a plaintiff must show that the representations were:   "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) although representations less formal than those made as part of a classic advertising campaign may

suffice, they must be disseminated sufficiently to the relevant purchasing public." *Applied Medical Resources Corp. v. Steuer*, 527 F.Supp.2d 489, 493 (E.D. Va. 2007) (citing *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002)).

In *Fashion Boutique*, the Second Circuit considered twenty-seven oral statements by plaintiff's competitor to customers wherein the competitor allegedly told customers that plaintiff's Fendi products were "inferior," "fake," "bogus," or a "different line" from that offered by plaintiff—even though all products were, in fact, identical. *Fashion Boutique of Short Hills, Inc.*, 314 F.3d at 54, 57. The Second Circuit first recognized that "the language of the [Lanham] Act cannot be stretched so broadly as to encompass all commercial speech." *Id.* at 57. To be considered commercial speech, "the contested representations [must be] part of an **organized campaign** to penetrate the relevant market," and "**must successfully reach[] a substantial number of the competitor's potential customers**." *Id.* at 57-58. "Thus, businesses harmed by isolated disparaging statements do not have redress under the Lanham Act." *Id.* Accordingly, the *Fashion Boutique* court "**easily conclude[d]** that Fashion Boutique failed to put forward sufficient evidence that defendants' actions constituted "commercial advertising or promotion" under the Lanham Act." *Id.* at 58; *see Applied Med. Res. Corp*, 527 F.Supp.2d at 493 (describing *Fashion Boutique* as the "seminal case" that set the standard for "commercial advertising or promotions" and stating that the *Fashion Boutique* standard for commercial advertising or promotions "has been uniformly embraced by district courts in [the Fourth] Circuit").

In *Chamilia, LLC v. Pandora Jewelry, LLC*, 2007 WL 2781246, *9 (S.D.N.Y. 2007), the court considered various false or misleading statements, including statements that were made by defendant at four different trade shows. Applying *Fashion Boutique*, the court found that "a rational jury could not find that Defendant's [trade show and other] 'representations [were] part

of an organized campaign to penetrate the relevant market.'" *Chamilia, LLC,* 2007 WL 2781246 at *9 (citing *Fashion Boutique*); *see also Applied Med. Res. Corp,* 527 F.Supp.2d at 493 (granting summary judgment to defendant after finding that six false statements to hospitals regarding plaintiff's medical device were "clearly inadequate to constitute advertising or promotion on the scale contemplated by the Lanham Act.")

Based on the foregoing, Plaintiff could not even allege a false advertising or promotion claim even if it could allege false statements or misrepresentations because the acts complained of are insufficient to establish an organized campaign of false statements to a substantial number of Plaintiff's customers.  Accordingly, Plaintiff's false advertising claim must be dismissed as wholly insufficient, if not entirely frivolous.

### C.  Plaintiff Cannot Invoke The Lanham Act To Obtain Federal Jurisdiction Over Its Contract Claims

At its core, Plaintiff's Complaint is seeking to keep IWT from lawfully competing in the underground coal mining industry.  To further this purpose, Plaintiff has conjured up as many claims as possible, and without any basis in law or fact, Plaintiff has alleged damages totaling $356,520,000 for the sole purpose of intimidating IWT and its employees to prevent lawful competition.  In so doing, Plaintiff has impermissibly attempted to ground its alleged contractual claims and ownership disputes in Lanham Act violations.  *See, e.g.,* Compl. at ¶39 ("L-3 owns all of the intellectual property rights as to all development of ACCOLADE system by IWT after the [First and Second JDAs]"); *Id.* at ¶ 41 ("L-3 considers [IWT's competing handset to be] a breach of the agreements between the parties"); *Id.* at ¶¶ 54-55 ("IWT's competing handset . . . uses the exact same preset text messages and user groups.   IWT's competing handset contains L-3's intellectual property . . . . IWT has sought certification of its handset as its own intellectual property with MSHA").

The Lanham Act, however, is not merely another means of resolving contractual disputes over ownership of intellectual property. *See Gibraltar, P.R., Inc. v. Otoki Group, Inc.*, 104 F.3d 616, 619 (4th Cir. 1997) (addressing a dispute where a joint venturer fail to assign trademarks and stating: "What [plaintiff] protests in this case is use in violation of rights of ownership . . . . The Lanham Act is designed to address the registration and infringement of trademarks, not ownership disputes arising out of contracts"); *Id.* ("A dispute over property ownership does not properly fall under federal law just because the property is a federally-created interest like a trademark or a copyright"). Accordingly, Plaintiff cannot seek to resolve any alleged ownership claim over the intellectual property in the ACCOLADE system by invoking the Lanham Act to determine whether IWT's is free to create competing products that work with IWT's products in the ACCOLADE system. *See id.* For all of the foregoing reasons, Plaintiff's Lanham Act claims must be dismissed. Because the Court lacks subject matter jurisdiction over all remaining claims, Plaintiff's complaint must be dismissed in its entirety.

### III.   Count II (Breach of Contract-Teaming Agreement) Must Be Dismissed

Plaintiff's breach of the Teaming Agreement claim, like all other claims herein, is entirely without merit, and even if the Court elects to retain jurisdiction, this claim must be dismissed pursuant to Rule 12(b)(6).

Plaintiff alleges that that the Teaming Agreement prohibits IWT from "competing with L-3's ACCOLADE system within the coal mining industry pursuant to Section 14 of the Teaming Agreement," and that L-3 has suffered damages in excess of $118,840,000. Compl. at ¶¶ 66-69. Stated simply, Section 14 contains no such restriction and Plaintiff's claim must be dismissed. Ex. 1 at § 14. Section 14, in its entirety, states (with emphasis added):

> To the extent permitted by law, **during the effective term of this Agreement**, [SYColeman] and [IWT] **each agree** that it will not

participate in any manner **in other teaming efforts that are competitive to this Teaming Agreement**.  Moreover, [SYColeman] and [IWT] **each agree** that it will **not compete independently (including the independent submission of a proposal to the Government) for work specified in this Agreement**.  The term "participate" as used herein includes (but is not limited to) the interchange of technical data with competitors.  Furthermore, the [IWT] shall not perform the work described in this Agreement, under the resulting Contract, for any party other than [SYColeman], and [SYColeman] will not contract with any party, to the exclusion of [IWT], for work described in this Agreement unless so directed by the Government.  **The Agreement shall not preclude either party from participating in or contracting individually on any Government or industry program, nor from offering its services as normally provided through catalog, schedule or other vehicles, which may arise in the general area of business related to the proposal which will be prepared**.

This provision was solely intended to prevent the parties from competing against each other while they were acting to prepare the NIOSH Proposal for the government's Solicitation. It in no way restricts IWT (or SYColeman) from competing in the underground coal mining industry, and in fact, expressly permits competition on any government or industry program and permits each party to "offer[] its services as normally provided through catalog, schedule or other vehicles, which **may arise in the general area of business related to the proposal** which will be prepared." Ex. 1 at § 14.  In any event, the provision was only effective during the term of the Teaming Agreement.  *Id.*  By its terms, the Teaming Agreement was expired at the earliest of numerous contingencies, including:  (1) "The finalization and execution of a Subcontract between Contractor and Subcontractor"; or (2) "The date is two years from the date [the Teaming] Agreement was executed."  Ex. 1 at § 3.1(g), (j).  The Subcontract was executed on October 18, 2007, and January 11, 2009 is two years from the date the Teaming Agreement was executed.  *See* Ex. 1 and Ex. 4.  Accordingly, the Teaming Agreement terminated no later than January 11, 2009 and any non-competition provisions therein terminated as of that date.

Even if the Teaming Agreement could be construed as lasting longer, there can be no dispute that the Teaming Agreement terminated upon successful completion of the Subcontract. After all, the Subcontract was the blanket contract for the wireless mesh technology deliverable and the First and Second JDAs were entered to facilitate completion of the Subcontract.  As evidenced by the Contract Close Out communications between the parties and the government, the Subcontract was completed on or before April 7, 2009.  Accordingly, any and all non-compete provisions in the Teaming Agreement expired on or before April 7, 2009—at the latest.

Accordingly, Plaintiff's claim for breach of the non-compete provision in the Teaming Agreement must be dismissed as wholly insufficient, if not entirely frivolous.

## IV.     Counts III-VI (Breach of Contract-First and Second JDAs) Must Be Dismissed

Plaintiff alleges two separate counts for breach of the First JDA and two separate counts for breach of the Second JDA, but these counts vary only in the relief sought.  Plaintiff's claims must be dismissed because (1) the First and Second JDAs have long since terminated; (2) the Second JDA amended and superseded any non-competition provision in the First JDA; (3) any non-competition provisions in the First and Second JDAs relate only to the competing use of FIP, and there is no allegation that Plaintiffs have used any FIP to prepare competing technology; (4) any non-compete provisions in the JDAs constitute unreasonable restraints on trade and are invalid, void and unenforceable; (5) IWT owns all intellectual property in the ACCOLADE system—either exclusively or jointly[5]; and (6) any claim for damages is without merit because the First and Second JDAs expressly limit liability for money damages.

### A.     Any Non-Compete Provisions in the First and Second JDAs Have Long Since Expired

---

[5] With the exception of the HAWK display system that is not at issue in this case.

Like the Teaming Agreement, which was intended to prevent competition during its effective term, Section 3.01(d) of the First and Second JDAs can only be read as attempts to prevent competition during their respective terms. The First JDA had a period of performance that ran from May 21, 2007 through April 16, 2008. Ex. 3. at MOD No.: 002. Accordingly, any non-competition provision contained in the First JDA—to the extent it could ever be construed as enforceable—was only in effect until April 16, 2008. The Second JDA had a period of performance that ran from May 12, 2008 through February 28, 2009. Ex. 6. Accordingly, any non-competition provision contained in the Second JDA—to the extent it could ever be construed as enforceable—was only in effect until February 28, 2009. Because the non-competition provisions have expired, Plaintiff fails to state a claim for breach of Section 3.01 in either the First or Second JDA. In any event, the First and Second JDAs were nothing more than amendments to the NIOSH Proposal and Subcontract, and each addressed how the parties would handle the budget shortfalls and specific tasks related to the Subcontract. Accordingly, there can be no dispute that the First and Second JDAs terminated—at the very latest—upon successful completion of the Subcontract on or before April 7, 2009. Accordingly, any and all non-compete provisions in the First and Second JDAs have long since expired and Plaintiff has no claim.

**B.     The Second JDA Amended And Superseded The First JDA**

The Second JDA does not include any FIP and there is no Exhibit B (defining FIP) attached to the Second JDA.[6]   *See* Ex. 5.  To the extent the Second JDA contains any provision related to FIP, the Second JDA refers to, amends and supersedes the First JDA—which precisely

---

[6] The absence of Exhibit B from the Second JDA may in and of itself require dismissal. Section 3.01(d) purports to prevent IWT from "prepare competing technology to the expressed application for sale within the expressed Field of Use." "Field of Use" is defined as "a specific product or service market application or other realization **using FIP**." Exs. 2, 5 at Art I. ¶ 11. Because the Second JDA does not include any FIP, the Second JDA cannot restrict competition.

delineated FIP in its Exhibit B.  *See id.* at 11 ("This Agreement sets forth the entire understanding between GS&ES and IWT pertaining to its subject matter and supersedes and replaces all prior oral or written Agreements between GS&ES and IWT pertaining to such subject matter").  Pursuant to the Second JDA, neither party was authorized to use FIP for underground coal mining, at least until the Agreement expired on February 28, 2009.

## C.     The First and Second JDA's Only Prevent Competition Using the FIP Defined in Exhibit B

In any event, it is clear that both JDAs—at best—could be read only to prohibit IWT from preparing competing technology using the FIP identified on Exhibit B to the First JDA, and Plaintiff's Complaint fails to allege that IWT prepared competing technology using the FIP identified in Exhibit B to the First JDA.

## D.     All Non-Compete Provisions Within the First And Second JDAs Are Unreasonable Restraints On Trade And Unenforceable As A Matter of Law

Although the First and Second JDAs have long since terminated and the Second JDA superseded the First JDA, the purported covenant not to compete in Section 3.01(d) constitutes an unreasonable restraints on trade and is unenforceable as a matter of law.  Accordingly, Plaintiff's claim for breach of Section 3.01(d) must be dismissed.

In order for a restrictive covenant, such as a non-compete, to be enforceable it must: "(1) meet general contract law requirements, (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities." *American Homepatient, Inc. v. Collier* 2006 WL 1134170, *2 (Del. Ch. 2006).[7]  To the extent Section 3.01 purports to restrict IWT from competing beyond the period of performance under the Second JDA and/or Subcontract,

---

[7] The Second JDA contains a Delaware choice of law provision. Ex. 5 at § 5.06. Nonetheless, the result would be the same under any state's law, including Virginia.

Section 3.01 constitutes an unreasonable restraint on trade because it contains no geographic restriction and is otherwise unlimited in time.  Without question a world-wide, perpetual non-compete is unenforceable.  *See, e.g., Liautaud v. Liautaud*, 221 F.3d 981, 988 (7th Cir. 2000) (finding plaintiff's perpetual non-compete agreement against defendant's business to be void and against public policy because the "infinite agreement injures the public [and] it stifles competition"); *Compton v. Metal Products, Inc.,* 453 F.2d 38, 44 (4th Cir. 1971) ("no citation is necessary for the proposition that such an agreement" placing a 20 year restriction on sale of competitive coal mining equipment "would violate the common law prohibition against agreements in restrain of trade as well as Section 1 of the Sherman Act, 15 U.S.C. § 1").

In this case the restraint on trade is particularly harmful to the health and safety of coal miners.  As the Solicitation, Subcontract and Complaint recognize, the communication systems that existed prior to IWT's fulfillment of the Subcontract were "not sufficient to provide the support required to effectively handle evacuations and rescued operations."  Solicitation at § (C)(II); Ex. 4 at § (C)(II); Compl. at ¶ 16.  In fact, the stated purpose and need for the Solicitation and Subcontract was to provide a wireless mesh communication system that would "avoid accidents, provide immediate communication of incidents to MSHA and dispatchers, and provide assistance to mine rescuers in saving lives."  Solicitation at § (C)(II); Ex. 4 at § (C)(II).  Accordingly, any restraint on trade imposed by Section 3.01(d) must be viewed in light of its impact on public health and safety.

## E.   IWT Owns All Relevant Intellectual Property In The ACCOLADE System

Plaintiff attempts to state a claim for breach of contract for IWT's use of its intellectual property by claiming "IWT has exploited the intellectual property jointly developed under [the First and Second JDAs]."  Compl. at ¶¶ 74, 87.   Whatever "exploited" means, Plaintiff has no

claim because IWT owns, either exclusively or jointly, all right title and interest to the handsets, fixed mesh nodes and gateway nodes at issue in this case.  Plaintiff's claims must be dismissed.

Plaintiff alleges that it "owns all of the intellectual property rights as to all development of ACCOLADE system by IWT after the [First and Second JDAs]."  Compl. at ¶ 39.  Plaintiff's claim, however, is either false or intentionally misleading.  If Plaintiff claims that it owns any of IWT's preexisting technology in the ACCOLADE System, it is incorrect as a matter of law.  *See, e.g.,* Exs. 2, 5 at § 3.01(b) (stating "No term or provision hereof will including licensing considerations for BIP, as such, terms and conditions for BIP utilization will be negotiated and addressed in a separate Agreement); *Id.* at Art. I. § 3 ("[BIP] shall mean preexisting inventions (whether or not patentable), trade secrets, processes, computer software . . . patents and copyrights in all countries owned by each party").

IWT is the owner of all its preexisting intellectual property in the ACCOLADE system and jointly owns all other components in ACCOLADE—with the exception of the HAWK system display which is not at issue in this case.  *See, e.g.,* Ex. 2 at § 2.01 (recognizing that the JDA and Subcontract called for "**IWT's adaptation of [its] existing mesh communication system**"); Ex. 2 at 1 (acknowledging IWT's preexisting technology rights stating:  "WHEREAS **IWT has developed proprietary data and technology, which will be used in the development of** a demonstration for a 1 watt version, **wireless mesh module for voice communications**"); Exs. 2, 5 at § 3.01(b) (recognizing that the First and Second JDAs in no way conveyed any interest in IWT's BIP to SYColeman or GS&ES); Ex. 1 at 9.1 (recognizing that IWT exclusively owns all rights in its preexisting wireless mesh communication system, and IWT and SYColeman will jointly own and "**each party . . . possess[es] an equal ownership share in**" intellectual property jointly developed); Exs. 2, 5 at § 3.01(a) (stating: "Upon

completion, IWT and [GS&ES] will **jointly own** and **each collectively retain, full right, title and interest in all developed FIP** [as defined Exhibit B to the First JDA]").   Because IWT either exclusively owns or jointly possesses all right, title and interest to the handsets, fixed mesh nodes and gateway nodes at issue, IWT is free to exercise its ownership rights in any manner.   Accordingly, Plaintiff's claims for "exploiting the intellectual property" must be dismissed.

### F.      Any Claim For Damages Is Without Merit Because The First And Second JDA Expressly Limits Liability For Money Damages

Plaintiff alleges that IWT, by virtue of its alleged breaches of the First and Second JDA, is "subject to liability in an amount up to that paid by L-3 to IWT under its agreements with L-3" and that amount is "in excess of $10 million dollars."  Compl. at ¶¶ 79, 93.  Moreover, Plaintiff seeks damages totaling $118,840,000.  *Id.* at ¶¶ 68-69, 80-81.

Plaintiff's damage claim, however, lacks any basis in law or fact.  As Plaintiff is well aware, the First and Second JDAs limit liability for any breach thereof, and provide:

> Limitation of Liability:  IN NO EVENT SHALL EITHER PARTY BE LIABLE HEREUNDER FOR ANY SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS OR DAMAGES FOR ANY INTERRUPTION OF BUSINESS), **EXCEPT TO THE EXTENT THE SAME IS THE SUBJECT OF A THIRD PARTY CLAIM ASSERTED AGAINST A PARTY ENTITLED TO INDEMNIFICATION HEREUNDER**.   IN NO EVENT SHALL EITHER PARTY'S TOTAL LIABILITY TO THE OTHER PARTY HEREUNDER EXCEED THE SUMS PAID TO IWT BY SYCOLEMAN **UNDER THIS AGREEMENT** UNDER WHICH THE CLAIM IS MADE.

Exs. 2, 5 at § 5.03 (caps in original). As an initial matter, all damages alleged by Plaintiff are special damages that cannot be recovered.  In any event, IWT only paid $250,000 to IWT under the First JDA, and $250,000 to IWT under the Second JDA, so even under the third party indemnification scenario contemplated by § 5.03, IWT could only be liable for up to $500,000—a far cry from the $118,840,000 alleged.  *See* Exs. 2, 5 at § 2.01.

For the foregoing reasons, Plaintiff fails to state a claim for breach of contract under Counts III-VI, and Plaintiff is not entitled to recover any damages from IWT.

**VI.**   **Count VII (Breach of Contract-Service Support Agreement) Must Be Dismissed**

Plaintiff alleges that "IWT is precluded from soliciting L-3's customers with any services or products that are offered by L-3, pursuant to the terms of the Service Support Agreement." Compl. at ¶ 96.   Contrary to Plaintiff's representation, there is absolutely no non-solicitation provision in the Service Support Agreement. *See generally* Ex. 8.   Accordingly, Plaintiff fails to state a claim for breach of the Service Support Agreement and Count VI must be dismissed.

**VII.**   **Count VIII (Constructive Trust) Must Be Dismissed**

Plaintiff alleges that IWT was "unjustly enriched" because the agreements between the parties contained non-competition provisions, Plaintiff relied on those non-competition provisions and IWT was unjustly enriched.   Compl. at ¶¶ 101-104.   In essence, Plaintiff is attempting to resurrect a claim based upon its terminated and unenforceable non-compete provisions.   Plaintiff, however, cannot assert a claim for unjust enrichment because there was a written agreement addressing the same subject matter.   *WRH Mortg., Inc. v. S.A.S. Associates*, 214 F.3d 528, 534 (4th Cir. 2000) ("Where a contract governs the relationship of the parties, the equitable remedy of restitution grounded in quasi-contract or unjust enrichment does not lie); *Inman v. Klockner-Pentaplast of Am., Inc.*,  467 F.Supp.2d 642, 655 (W.D. Va. 2006) ("Unjust enrichment is an implied or quasi-contract remedy that is based on equitable principles, therefore is inapplicable when an express contract exists between the parties").   Accordingly, Plaintiff's claim for "unjust enrichment" or "constructive trust" must be dismissed.

**VIII.**   **Count IX (Declaratory Judgment) Must Be Dismissed**

Plaintiff alleges that it is entitled to a declaratory judgment that affirms its exclusive rights to market to coal mines pursuant to Virginia Code § 8.01-184. *See* Compl. at ¶¶ 108-111. For the reasons stated above, including Plaintiff's failure to establish subject matter jurisdiction under the Lanham Act, Plaintiff's claim for a declaratory judgment must be dismissed.

**IX.   Count X (Tortious Interference with Business Expectancy) Must Be Dismissed**

Plaintiff alleges that it "had a business expectancy to engage distributors to sell the ACCOLADE system," and that IWT and its individual employees "intentionally, and by the use improper means, interfered with L-3's expectancy." Compl. at ¶¶ 113, 115. Again, Plaintiff fails to state a claim, and Plaintiff's tortious interference count must be dismissed.

Plaintiff merely alleges that it had a "business expectancy to engage distributors." Compl. at ¶ 113. There is no factual allegation identifying particular distributors and no factual allegation supporting an inference that a contract with the(se) unnamed distributor(s) was reasonably certain. Plaintiff's failure to allege facts establishing "reasonably certain business opportunities" is fatal to Plaintiff's tortious interference claim. *See, e.g., Brainware, Inc. v. Mahan*, 2011 WL 3734456, *8 (E.D. Va. 2011) (dismissing plaintiff's "bare allegations" and stating: "Although [plaintiff] alleges that defendant interfered with its relationship with Allstate, a prospective client, **its Complaint alleges no facts establishing any reasonably certain business opportunities**"); *Peterbilt of Bristol, Inc. v. Mac Trailers, Mfg.*, 2009 WL 4063663, *3 (W.D. Va. 2009) (requiring facts establishing a reasonably certain business opportunity); *Commercial Business Systems, Inc. v. Halifax Corp.*, 253 Va. 292, 301 (1997) (plaintiff's subjective expectations and hopes of a business relationship are insufficient).

Moreover, there is no factual allegation that the individual defendants or IWT intentionally engaged in *any* improper means or method to prevent Plaintiff from "engaging

[unspecified] distributors to sell the ACCOLADE system."  All that appears is the conclusory allegation that Defendants "intentionally, and by the use of improper means, interfered."  Compl. at ¶115.  In fact, there can be no allegation of intentional interference by improper means without identification of the distributors and factual allegations of improper conduct taken to prevent each reasonably certain relationship from forming.  *See Century-21 v. Elder*, 239 Va. 637, 642, (1990) (plaintiff must allege that defendant intended to interfere with the specific contract or expectancy at issue); *GTSI Corp. v. Wildflower Int'l, Inc.*, 2009 WL 2160451 at *8 (E.D.Va. 2009) (granting dismissal because claimant failed to allege a specific expectancy and its "attempt to make a blanket allegation about an undefined set of expectancies is insufficient as a matter of law"); *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F.Supp.2d 700, 705-06 (E.D.Va.2004) (dismissing tortious interference count as "too broad and conclusory to plead a specific, existing contract or expectancy with a specific party").  Finally, there is no factual allegation supporting the conclusion that Defendants' unspecified conduct caused the loss of a reasonably certain contract.  *See  New York Carpet World, Inc. v. Grant*, 1990 WL 123871, *2 (4th Cir. 1990).  For the foregoing reasons, Plaintiff's tortious interference claim must be dismissed.

## X.    Count XI (Unfair Business Practices) Must Be Dismissed

Plaintiff purports to assert a claim for "unfair business practices" or "unfair trade practices."  Virginia does not have such a cause of action.  To the extent Plaintiff is attempting to assert a claim for "unfair competition" under Virginia common law, Plaintiff's claims must be dismissed for the same reasons Plaintiff fails to state a claim for "passing off" or "reverse passing off" under the Lanham Act.  Virginia has "a narrow, sharply defined common law definition of unfair competition." *Phoenix Renovation Corp. v. Rodriguez*, 403 F.Supp.2d 510, 517 (E.D. Va. 2005). Under Virginia law, "[t]he essential element of unfair trading is deception,

by means of which goods of one dealer are palmed off as those of another, whereby the buyer is deceived, and the seller receives the profit which, but for such deception, he would not have received." *Id.* (quoting *Benj. T. Crump Co. v. J.L. Lindsay, Inc.*, 130 Va. 144, 107 S.E. 679, 684 (1921)).  Accordingly, Plaintiff's claim for unfair business practices must be dismissed.

**XI.    Count XII-XIII (Virginia Business Conspiracy and Common Law Conspiracy) Must Be Dismissed**

Plaintiff alleges two conspiracy claims, statutory business conspiracy and common law conspiracy.  In its business conspiracy claim, Plaintiff alleges that "IWT [and its distributors] Logi-Tec and Bookcliff combined to wrongfully solicit L-3's customers by distributing IWT's products to L-3's customers' mines, by targeting L-3's customers with advertising of IWT's products, and by other acts yet to be discovered." Compl. at ¶ 133. In its common law conspiracy claim, Plaintiff alleges that "IWT combined and acted together with its distributors Logi-Tec and Bookcliff for the purpose of breaching the agreements between the parties, interfering with L-3's contracts and business expectancies and to otherwise harm L-3 in its business or property without any justification whatsoever, and unjustly to enrich themselves at the expense of L-3." *Id.* at ¶ 139.  Plaintiff, however, fails to state a claim for statutory and/or common law conspiracy because: (1) Plaintiff fails to plead its alleged conspiracies with particularity; (2) Plaintiff fails to allege any unlawful act or intent to injure Plaintiff, (3) conspiracy to breach a contract is not actionable under a statutory business conspiracy claim; and (4) Plaintiff fails to allege any act of inducement to breach a contract to support its common law conspiracy claim.

To state a claim for business conspiracy under Virginia law, plaintiff must show (1) a combination of two or more persons for the purpose of willfully and maliciously injuring the plaintiff in his business; and (2) resulting damage to the claimant. VA. CODE ANN. §§ 18.2- 499-500. *See also Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 596 (1984).  An act is

"willful and malicious" if "undertaken to injure the plaintiff intentionally, purposefully, and without legal justification." *Simmons v. Miller*, 261 Va. 561, 544 S.E.2d 666, 667 (2001)).

To state a claim for common law conspiracy under Virginia law, plaintiff must show (1) an agreement between two or more persons, (2) to accomplish some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means, and (3) resulting damages to plaintiff. *Commercial Business Systems, Inc. v. Bellsouth Services, Inc.*, 249 Va. 39, 48 (1995); *Taylor v. CNA Corp.*, 782 F.Supp.2d 182, 204 (E.D. Va. 2010). "[I]n Virginia, a common law claim of civil conspiracy generally requires proof that the underlying tort was committed." *Taylor*, 782 F.Supp.2d at 204 (citing *Almy v. Grisham*, 273 Va. 68, 80, 639 S.E.2d 182 (2007)).

A plaintiff must plead statutory and common law conspiracies with particularity, and mere conclusory allegations are insufficient. *See, e.g., TradeStaff & Co. v. Nogiec*, 2008 WL 8201050, *5 (Va.Cir.Ct. 2008) ("[B]oth statutory and common law conspiracy claims must be pled with particularity and not mere conclusory language") (citing *Bowman v. State Bank of Keysville*, 229 Va. 534, 541 (1985)); *Government Employees Ins. Co. v. Google, Inc.*, 330 F.Supp.2d 700, 706 (E.D. Va. 2004) ("[B]usiness conspiracy, like fraud, must be pleaded with particularity, and with more than mere conclusory language. The heightened pleading standard prevents every business dispute over unfair competition becoming a business conspiracy claim").

Plaintiff fails to state a claim for statutory or common law conspiracy because Plaintiff merely alleges that Defendants "combined and acted together" without any factual allegations supporting such a conclusion. *See* Compl. ¶¶ 131,139. Accordingly, Plaintiff fails to allege its conspiracy claims with particularity.

Plaintiff also fails to allege any unlawful or criminal act or willful intent to injure Plaintiff in its trade or business. As the Supreme Court of Virginia has repeatedly held, "there

can be no conspiracy to do an act the law allows." *Hechler Chevrolet v. General Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744 (1985).

Although Plaintiff has failed to allege any breach of contract on the part of Defendants—and there is no contractual prohibition against solicitation—an alleged conspiracy to breach a contract is not sufficient to state a statutory business conspiracy claim. *Station #2, LLC v. Lynch*, 695 S.E.2d 537, 541 (2010). While it may, in some circumstances, be possible to state a common law conspiracy claim where parties conspire to induce another to breach a contract, Plaintiff fails to allege that any facts that would support a claim that Defendants' induced anyone to breach a contract with Plaintiff. *See Bowman v. State Bank of Keysville*, 229 Va. 534, 541 (1985) (dismissing plaintiffs' common law conspiracy claim because it was "devoid of any factual allegations to support the idea that [defendant] induced the [others] . . . to terminate the plaintiffs' employment"). For the foregoing reasons, Plaintiff's claims for common law and statutory business conspiracy must be dismissed.

WHEREFORE, Defendants respectfully requests that this Court dismiss Plaintiff's Complaint, in its entirety, pursuant to FRCP 12(b)(1) and 12(b)(6), and award Defendants their attorneys' fees and costs for defending this suit and such other relief as it may deem appropriate.

Dated: February 16, 2012                    Respectfully submitted,

IWT DEFENDANTS

By /s/ Joshua F. P. Long
                Of Counsel

Joshua F. P. Long (VSB#65684)          J. Barrett Lucy (VSB#48512)
Woods Rogers PLC                       Freeman Dunn Alexander Tiller
10 S. Jefferson Street, Suite 1400     Gay & Lucy, PC
P.O. Box 14125                         1045 Cottontown Road
Roanoke, Virginia 2 4038-4125          Lynchburg, VA  24503
Tel (540)983-7600; Fax (540)983-7711   Tel (434)528-3400, Fax (434)385-0365
jlong@woodsrogers.com                  BLucy@freemandunn.com
        Counsel for IWT Defendants              Counsel for Rod Passmore

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of February, 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

    Mark T. Stancil
    Deneen J. Melander
    Robbins, Russell Englert, Orseck, Untereiner & Sauber, LLP
    1801 K. Street, NW, Suite 411
    Washington, DC  20006
        Counsel for Plaintiff

And I hereby certify that I will mail the document by U.S. Mail to the following non-filing user:

    Steven L. Levitt
    Steven L. Levitt & Associates, PC
    129 Front Street
    Mineola, NY 11501
        Counsel for Plaintiff

                        /s/ Joshua F. P. Long