UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| L-3 NATIONAL SECURITY SOLUTIONS, INC., ) AS SUCCESSOR TO L-3 SERVICES, INC., ) GLOBAL SECURITY & ENGINEERING ) SOLUTIONS DIVISION ) ) Plaintiff, ) ) v. ) ) INNOVATIVE WIRELESS TECHNOLOGIES, ) INC., ERIC HANSEN, PHILIP CARRIER, PAUL ) SCHMIDT, JOHN STECKLEY, ROD ) PASSMORE, DARREN KREEGER, JASON ) JARRETT, and LOGI-TEC, INC., ) ) Defendants. ) | Case No. **1:12-CV-00059** (LMB/TRJ) |

## SECOND AMENDED COMPLAINT

Plaintiff L-3 National Security Solutions, Inc., as successor to L-3 Services, Inc., Global Security & Engineering Solutions Division ("L-3" or "Plaintiff"), by and through its undersigned counsel, alleges as set forth below.

## INTRODUCTION

1.      L-3 and Innovative Wireless Technologies, Inc. ("IWT") are parties to contracts that expressly bar IWT from selling certain products manufactured by L-3, or which incorporate technology developed or owned by L-3, within the coal mining industry. Those contracts also expressly protect L-3's rights in certain intellectual property that is crucial to L-3's products and L-3's marketing and sale of those products. IWT and its employees, however, have engaged in a pattern of deceptive conduct, including, but not limited to:

        a)      posing as L-3 employees;

1

b)      surreptitiously testing IWT equipment on L-3's systems; and

c)      misrepresenting to L-3's customers, distributors, and the federal Mine Safety and Health Administration ("MSHA") that L-3's intellectual property is IWT's.

2.      By virtue of these acts, and of other acts as yet unknown to L-3, IWT has enriched and will continue to enrich itself by millions of dollars at the direct expense of L-3, whose current and potential customers and distributors have been (and continue to be) confused and misled by IWT's misconduct. As set forth in detail below, IWT and its employees committed numerous violations of the Lanham Act, 15. U.S.C. § 1051 *et seq.*; have deliberately breached IWT's contracts with L-3; have tortiously interfered with L-3's contracts with its customers; have tortiously interfered with L-3's business relations with distributors; tortiously interfered with L-3's business expectations; unlawfully solicited L-3's customers; have tortiously impersonated L-3's and/or the ACCOLADE team's employees; and have unlawfully attempted to certify a handset containing L-3 intellectual property as its own with the MSHA, among other things.

## PARTIES

3.      L-3 National Security Solutions, Inc., as successor to L-3 Services, Inc., Global Security & Engineering Solutions Division, is a Delaware corporation authorized to do business in Virginia with an office located at 3750 Centerview Drive, Chantilly, Virginia. L-3 Services, Inc., Global Security & Engineering Solutions Division was the successor to SYColeman Corporation, a wholly owned subsidiary of L-3 Communications Corporation.

4.      Upon information and belief, Defendant Innovative Wireless Technologies, Inc. is a Virginia corporation with its principal place of business in Forest, Virginia.

5.    Upon information and belief, Defendant Eric Hansen ("Hansen") is Chairman, Chief Executive Officer, President, co-founder, and majority shareholder of IWT and resides in the Commonwealth of Virginia.

6.    Upon information and belief, Defendant Philip Carrier ("Carrier") is Vice President of Sales and Marketing of IWT and resides in the Commonwealth of Virginia.

7.    Upon information and belief, Defendant Paul Schmidt ("Schmidt") is employed as the System Engineering Manager of IWT and resides in the Commonwealth of Virginia.

8.    Upon information and belief, Defendant John Steckley ("Steckley") is an employee of IWT and resides in the Commonwealth of Virginia.

9.    Upon information and belief, Defendant Rod Passmore ("Passmore") is employed as the Senior Program Manager of IWT and resides in the Commonwealth of Virginia.

10.    Upon information and belief, Defendant Darren Kreeger ("Kreeger") is employed as a Software Engineer at IWT and resides in the Commonwealth of Virginia.

11.    Upon information and belief, Defendant Jason Jarrett ("Jarrett") is employed as an Engineer at IWT and resides in the Commonwealth of Virginia.

12.    Upon information and belief, Defendant Logi-Tec Inc. ("Logi-Tec") is a Pennsylvania corporation with its principal place of business in Monroeville, Pennsylvania. Logi-Tec is subject to the jurisdiction of this Court because, as will be demonstrated herein, Logi-Tec has, directly and through agents, transacted business within the Commonwealth of Virginia, contracted to supply services within the Commonwealth of Virginia, caused tortious injury to Plaintiff by various acts and omissions in this Commonwealth and caused tortious injury in the Commonwealth of Virginia by acts and omissions outside the Commonwealth of

5231351

Virginia arising from its doing and soliciting of business, and its derivation of substantial revenue from services rendered within the Commonwealth of Virginia.

**JURISDICTION AND VENUE**

13.    This Court has original-subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this dispute arises under the laws of the United States, including the Federal Lanham Act, 15 U.S.C. § 1051 *et seq*.

14.    This Court has supplemental jurisdiction over L-3's state-law claims pursuant to 28 U.S.C. § 1367.

15.    Venue is proper in this District because "a substantial part of the events or omissions giving rise to" Plaintiff's claims occurred in this District, 28 U.S.C § 1391(b), and because Defendant IWT is subject to personal jurisdiction in this District, *id.* § 1391(c).

**FACTUAL BACKGROUND**

**L-3 Conceives Of The ACCOLADE System**

16.    On January 2, 2006, the Sago Mine in Sago, West Virginia, exploded, collapsed, and trapped thirteen miners, only one of whom survived. Existing safety equipment was insufficient to communicate with or locate the trapped miners during that incident.

17.    In response, Congress enacted the Mine Improvement and New Emergency Response Act of 2006 ("MINER Act"). Among other things, the MINER Act requires that mine operators be able to track and communicate with their miners in the event of an accident.

18.    L-3 is one of the world's leading providers of sophisticated communications equipment. L-3 is the owner of its trademarked ACCOLADE™ Wireless Mesh Communications System ("ACCOLADE"). To help mine operators comply with the MINER Act's tracking and

communication systems, L-3 developed ACCOLADE, which it now sells to mine operators. ACCOLADE meets and exceeds the MINER Act's safety requirements.

19.     The L-3 ACCOLADE system provides a self-healing, redundant and survivable voice and data network. Miners using ACCOLADE can communicate among themselves (that is, miner-to-miner) using voice and text messages and with other below-ground, as well as above-ground personnel. ACCOLADE can track each miner who is carrying a Mesh Miner Radio ("MMR") while underground, show his or her precise location on a computer screen above ground, and allow each miner to communicate with personnel on the surface, even during a disaster that would disable conventional wired communications.

20.     The L-3 ACCOLADE Wireless Mesh Communications System includes the following key components:

   a)     The Mine Operations Center provides the central point for monitoring the network and tracking the position of all personnel within the mine;

   b)     MMRs provide each miner with robust voice and text communications as well as the ability for above ground personnel and others to locate the miner;

   c)     Fixed Mesh Nodes are strategically located throughout the mine, and allow for the dynamic routing of all communications throughout the network;

   d)     Gateway Nodes serve as interface points between the above-and below-ground networks.

21.     ACCOLADE was developed in response to a research initiative established as part of the MINER Act. Congress passed an emergency supplemental appropriation to the

National Institute for Occupational Health and Safety's ("NIOSH") Office of Mine Safety and Health Research ("OMSHR"). Congress gave OMSHR funding to develop existing and new technologies related to oxygen supply, refuge chambers, and communications and tracking.

22.     As part of OMSHR's research, on November 17, 2006, the Centers for Disease Control and Prevention ("CDC") issued Request For Proposal ("RFP") 2007-N-09181, "Wireless Mesh Mine Communication System," to develop an underground-communication system that was highly reliable and would provide in-mine and mine-to-surface voice-and-data communications that would meet the requirements of the MINER Act. Responses to the RFP were due on January 4, 2007.

23.     L-3 conceived of the ACCOLADE system based on its prior work, developed for the Defense Advanced Research Projects Agency ("DARPA"), in advanced communications and other tracking devices (including L-3's tracking algorithm) and its systems-engineering expertise. Because L-3 had not developed mesh technology, it decided to hire a subcontractor to develop aspects of the ACCOLADE technology. IWT was one of several entities that L-3 considered as potential subcontractors for that project. IWT had previously developed mesh technology, but its existing technology could not satisfy many of the RFP's requirements. IWT had never used its mesh technology underground, its technology permitted only text communications and had no voice-communications capability.

**L-3 And IWT Execute Several Agreements**
**To Develop L-3's Accolade System**

24.     L-3 and IWT entered into a Teaming Agreement ("Teaming Agreement") to compete for the CDC's Wireless Mesh Mine Communication System contract. The parties agreed that L-3 would be the prime contractor and that IWT would be the subcontractor. *See*

Teaming Agreement ¶ 5.1. IWT executed the Teaming Agreement on December 20, 2006, and L-3 executed the Teaming Agreement on January 11, 2007.

25.     Pursuant to the Teaming Agreement, L-3 provided IWT with proprietary information.

26.     The Teaming Agreement included a provision restricting the use of L-3's proprietary information by IWT. The Teaming Agreement provides, *inter alia*, in section 4 entitled "Protection of Proprietary Information," that "[t]he restriction and obligations as outlined herein shall expire three years after the date of execution of this Agreement and shall remain in effect after its expiration or termination."

27.     The Teaming Agreement also includes a provision restricting IWT from competing with L-3. The Teaming Agreement provides, *inter alia*, in section 14 entitled "Non-Competition," that "[t]o the extent permitted by law, during the effective term of this Agreement, contractor and the Subcontractor each agree that it will not participate in any manner in other teaming efforts that are competitive to this Teaming Agreement."

28.     L-3's response to the RFP was successful and L-3 was awarded a contract to develop ACCOLADE for installation in mines nationally, pursuant to the provisions of the MINER Act.

**The 2007 Joint Development Agreement**

29.     Between on or about May 21 and 23, 2007, L-3 and IWT entered into their first Joint Development Agreement ("2007 JDA") to build L-3's ACCOLADE system. The recitals to the 2007 JDA provide that the purpose of the 2007 JDA was the development of a "wireless

mesh module for voice communications." IWT agreed to "support [L-3's[1] research and development] project relating to the design and production of a wireless mesh communications system for use in underground coal mines." 2007 JDA Ex. A. IWT specifically agreed to "adapt their existing mesh communications system for the underground coal mine environment in order to support an early demonstration either as part of the CDC/NIOSH contract in the Imperial Mine or underground to support other coal mine communications opportunities." Id. (emphasis added).

30.     Paragraph 3.01 of the 2007 JDA delineates the parties' property rights in the intellectual property developed thereunder.

31.     Paragraph 3.01(b) provides that the parties' jointly owned property, called Foreground Intellectual Property ("FIP"), "does not include background or pre-existing intellectual property (BIP)." That paragraph also required that "terms and conditions for BIP utilization will be negotiated and addressed in a separate agreement." 2007 JDP ¶ 3.01(b) (emphasis added).

32.     IWT expressly agreed to limits on its ability to use mesh wireless technology in the underground-coal-mining industry. Paragraph 3.01(d) provides, "Each PARTY shall retain the right to use, free of charge, any product or process, developed under this Agreement which contains or is based on any of FIP and/or DERIVATIVES thereof, for any future applications, products or purposes in any Field of Use except for underground coal mining applications whereby [SYColeman] L-3 will retain exclusive rights to the wireless mesh technology for voice communications application of the developed FIP." (emphasis added). Additionally, Paragraph

---

[1] The 2007 JDA was between SYColeman Corporation and IWT. SYColeman Corporation was L-3's wholly owned subsidiary.

3.01(d) provides that "IWT will not prepare competing technology to the expressed application for sale within the expressed field of use." (emphasis added).

33.    The 2007 JDA also provides, at paragraph 5.09(a), that neither party could "disclose, use or exploit any PROPRIETARY INFORMATION received from the other PARTY," including that developed under the 2007 JDA. Paragraph 5.09(c) recognizes that "money damages would not be an adequate remedy" and entitles the injured party to obtain "the remedies of injunction, specific performance and other equitable relief for any threatened or actual breach" of this provision without the necessity of providing a bond.

34.    Between on or about May 23 and 25, 2007, L-3 and the Federal Government entered into Contract No. 200-2007-20388 ("Contract") to develop the underground-communication system contemplated by the RFP. The Contract provided for three phases: Phase I (system design); Phase II (system development and demonstration); and Phase III (demonstration of a prototype system). The Government reserved discretion to determine whether to proceed to Phase III based on the success of the preceding phases.

35.    L-3 and IWT then entered into a Subcontract that outlined the work IWT would perform to help L-3 execute its government contract. The Subcontract was executed by L-3 on October 17, 2007 and by IWT on October 18, 2007. The Subcontract specifically incorporated the Teaming Agreement by reference in paragraph H.12.

36.    In addition to the provisions it agreed to in the Subcontract, in recognition of the fact that its role was limited to support development of L-3's project, see 2007 JDA at Ex. A, IWT has repeatedly acknowledged that the ACCOLADE system belongs to L-3.

37.    An example of that recognition may be found in an IWT press release dated July 15, 2008, which states as follows:

Innovative Wireless Technologies (IWT) today announced that in-mine operation of its wireless mesh communications technology was successfully demonstrated as part of L-3 Communications' Wireless Mesh Mine Communications System. IWT is providing its communications technology to the team led by L-3's Global Security & Engineering Solutions (GS&ES) division which is currently developing the system under a research and design contract from the National Institute for Occupational Safety and Health (NIOSH).

This in-mine demonstration at the International Coal Group's Sentinel Mine in Philippi, WV was conducted for personnel from the mining industry and NIOSH. As a result of this successful system event, which included demonstrations of wireless voice and data capabilities, NIOSH has authorized the L-3 GS&ES team to enter into the final phase of the research and development contract, which will result in a commercially-available product for the mining industry by the end of the year. The L-3 team will deploy a complete system in ICG's Sentinel mine in August.

"IWT is pleased to be part of the L-3 Communications team selected by NIOSH to deliver a wireless mesh communications system in response to the MINER Act of 2006" said Eric Hansen, President and CEO of IWT.

See Press Release, Innovative Wireless Technologies, IWT Provides Critical Component to

Successful Mine Test (July 15, 2008), available at http://www.iwtwireless.com/?p=69.

(Emphasis added.)

38.     Additionally, as explained later herein, IWT also acknowledged L-3's ownership

of the ACCOLADE System in later agreements between the parties.

**The 2008 Joint Development Agreement**

39.     Between on or about August 4 and 7, 2008, IWT and L-3 entered into an

additional Joint Development Agreement ("2008 JDA"). No longer was the development of

voice communication an issue. Instead, the focus and goal of the 2008 JDA was to improve the

tracking capabilities of L-3's ACCOLADE system, and to "gain[] entry into the underground

5231351

wireless communications coal market by making progress toward full commercialization of ACCOLADE to include government certifications of mesh hardware." 2008 JDA Ex. A.

40.     As was the case with the 2007 JDA, the 2008 JDA specifically delineated the parties' property rights in intellectual property to be developed thereunder. It provided that "IWT will not prepare competing technology to the expressed application for sale within the expressed Field of Use [underground-coal-mining applications]." 2008 JDA ¶ 3.01(d). And, as in the 2007 JDA, the parties agreed not to "disclose, use, or exploit" each other's proprietary information and agreed that an injured party could obtain equitable remedies, including injunctive relief, without needing to provide a bond, because money damages are not an adequate remedy for such breach. Id. ¶ 5.09(a), (c).

41.     On or about September 5, 2008, L-3 and IWT entered into a Purchase Order Agreement, PO RC-00001.

42.     Purchase Order Agreement RC-00001 specifically incorporated the 2008 JDA by reference: "Joint Development Agreement ("JDA") #TS2-08-IRAD001 is herein incorporated by reference." Exhibit B to Purchase Order Agreement RC-00001 was attached to the 2008 JDA and/or incorporated by reference through PO RC-00001.

43.     Purchase Order Agreement RC-00001 specifically stated that "[t]his Purchase Order is issued in accordance with the following attachments, listed in order of Precedence:

        1. L-3 Communications Corporation's General Terms and Conditions attached
        hereto except as modified below . . . ."

44.     Thus, L-3's General Terms and Conditions controlled over all other incorporated documents.

45.     The sections of L-3's General Terms and Conditions concerning IWT's potential liability for its breach, and L-3's entitlement to damages as a result of an IWT breach, were neither modified nor limited.

46.     PO RC-00001 provides in pertinent part as follows:

a.     Paragraph 20, entitled "Indemnification" provides as follows: "(a) Seller shall indemnify, hold harmless, and at Buyer's request, defend Buyer, its officers, directors, customers, agents and employees against all claims, liabilities, damages, losses and expenses, including attorneys' fees and cost of suit arising out of or in way connected with the Goods or Services provided under this Agreement, including without limitation: . . . (iv) any claim based on the negligence, omissions or willful misconduct of Seller or any of Seller's agents, subcontractors, employees, or anyone acting on behalf of Seller."

b.     Further, Paragraph 20(a) provides that "Seller [IWT] agrees to pay or reimburse all costs that may be incurred by Buyer [L-3] in enforcing this indemnity, including attorneys' fees."

c.     Paragraph 29, entitled "Survival," provides that that "all of the provisions of this Contract shall survive the termination (whether convenience or default), suspension or completion of this Contract unless they are clearly intended to apply only during the term of this Contract."

d.     Thus, PO RC-00001 provides for IWT's unlimited liability for its breach, and that IWC is responsible for all of L-3's legal fees, arising out of same.

47.     Exhibit B of PO RC-00001 also further delineated the parties' Intellectual

Property rights in Section 8.0 therein.

    48.    Section 8.2 of Exhibit B to PO RC-00001 defined the Intellectual Property rights of the parties in the MMR – Hardware Design as follows:

    a.    Section 8.2.2 of Exhibit B to the PO RC-00001 provided that "[t]he following IP was co-developed under the IWT/[L-3] joint development agreement. 900 MHz power amplifier and low noise amplifier (LNA)."

    b.    Section 8.2.3 of Exhibit B to the PO RC-00001 provided that "[t]he following technology is considered open source and has no restrictions of use except those required by NIOSH/CDC. Audio Processing design[,] . . . . General Purpose I/O & User Interface design[, and] . . . . Battery Charging/Power Supply design."

    49.    Section 8.3 of Exhibit B to the PO RC-00001 defined the Intellectual Property Rights of L-3 and IWT in the MMR – Software Design as follows:

    a.    Section 8.3.2 of Exhibit B to the PO RC-00001 provided that "[t]he following technology is considered open source and has no restrictions of use except those required by NIOSH/CDC. ·Audio processing firmware[,] . . . . Time division voice over mesh[, and] . . . . General purpose I/O & user Interface firmware."

    50.    Section 8.4 of Exhibit B to the PO RC-00001 defined the Intellectual Property Rights of the parties in the Fixed Mesh Node ("FMN") – Hardware Design as follows:

    a.    Section 8.4.2 of Exhibit B to the PO RC-00001 provided that "[t]he following IP was co-developed under the IWT/[L-3] joint development agreement. 900 MHz power amplifier and low noise amplifier (LNA)

[and] . . . . 400 MHz power amplifier and low noise amplifier (LNA)."

b.     Section 8.4.3 of Exhibit B to the PO RC-00001 provided that "[t]he following technology is considered open source and has no restrictions of use except those required by NIOSH/CDC. Packaging and mechanical design[,] . . . . Intrinsic Safe power supply and battery design[,] . . . . FPGA hardware design[,] . . . . Time division voice over mesh[, and] . . . . Battery charging/Power supply design."

51.     Section 8.5 of Exhibit B to the PO RC-00001 defined the Intellectual Property Rights of the parties in the FMN – Software Design as follows:

a.     Section 8.5.2 of Exhibit B to the PO RC-00001 provided that "[t]he following technology is considered open source and has no restrictions of use except those required by NIOSH/CDC. ·Leaky feeder network protocol[;] . . . . FPGA code[;] . . . . Power Supply/Battery firmware[; and] . . . . General purpose I/O, serial and ethernet interface firmware."

52.     Section 8.6 of Exhibit B to the PO RC-00001 defined the Intellectual Property Rights of the parties in the Gateway Node ("GWN") – Hardware Design as follows:

a.     Section 8.6.2 of Exhibit B to the PO RC-00001 provided that "[t]he following IP was co-developed under the IWT/[L-3] joint development agreement. 900 MHz Power amplifier and low noise amplifier (LNA)."

b.     Section 8.6.3 of Exhibit B to the PO RC-00001 provided that "[t]he following technology is considered open source and has no restrictions of use except those required by NIOSH/CDC. Wide Area Network (WAN) Interface[,] . . . . Packaging and Mechanical design[,] . . . . Communication

14

System Integration design[, and] . . . . FPGA hardware design."

53.     Section 8.7 of Exhibit B to the PO RC-00001 defined the Intellectual Property

Rights of the parties in the GWN – Software Design as follows:

      a.      Section 8.7.2 of Exhibit B to the PO RC-00001 provided that "[t]he

following technology is considered open source and has no restrictions of

use except those required by NIOSH/CDC. Leaky feeder network

protocol[,] . . . . FPGA code[, and] . . . . Power Supply/Battery Firmware."

54.     Section 8.8 of Exhibit B to the PO RC-00001 defined the Intellectual Property

Rights of the parties in the Leaky Feeder Base Station ("LFBS") – Hardware Design as follows:

      a.      Section 8.8.2 of Exhibit B to the PO RC-00001 provided that "[t]he

following IP was co-developed under the IWT/[L-3] joint development

agreement. 400 MHz power amplifier and low noise amplifier (LNA)."

      b.      Section 8.8.3 of Exhibit B to the PO RC-00001 provided that "[t]he

following technology is considered open source and has no restrictions of

use except those required by NIOSH/CDC. Leaky feeder network

coupler[,] . . . . Packaging and mechanical design[,] . . . . Communication

system integration design[, and] . . . . FPGA hardware design."

55.     Section 8.9 of Exhibit B to the PO RC-00001 defined the Intellectual Property

Rights of the parties in the LFBS – Software Design as follows:

      a.      Section 8.9.2 of Exhibit B to the PO RC-00001 provided that "[t]he

following technology is considered open source and has no restrictions of

use except those required by NIOSH/CDC. Leaky feeder network

protocol[,] . . . . FPGA code[, and] . . . . Power Supply/Battery firmware."

56. Section 8.10 of Exhibit B to the PO RC-00001 defined the Intellectual Property Rights of the parties in the mProv - Mesh Network Management Software as follows:

    a. Section 8.10.2 of Exhibit B to the PO RC-00001 provided that "[t]he following technology is considered open source and has no restrictions of use except those required by NIOSH/CDC. HAWK$^{TM}$ plug-in for mProv$^{TM}$."

57. Change order #2 to PO RC-00001 extended the period of performance for the 2008 JDA and PO RC-00001 through March 2009.

58. With respect to all of the above technology, L-3 has an ownership interest in all such technology denominated as either jointly owned or open source.

59. On or about December 12, 2008, IWT issued a press release announcing that the U.S. Mine Safety and Health Administration (MSHA) had approved L-3's ACCOLADE system, which it described as "L-3's wireless mesh system." (emphasis added).

60. On February 6, 2009, L-3 and IWT subsequently entered into Purchase Order Agreement No. 71GD070008, Change Order No. 5, that incorporated the Subcontract and modified the 2007 JDA.

61. In August 2010, L-3 and IWT entered into a Service Support Agreement ("SSA"). In the SSA IWT agreed to install ACCOLADE systems on behalf of L-3.

62. The SSA was entered into for the purpose of the installation, delivery and acceptance of L-3's system to L-3's customers.

63. The SSA defined the ACCOLADE System as L-3's system: "L-3 GS&ES intends to market, sell, or lease its System to, or for the benefit of, coal mining industry companies located in the United States." SSA at 2 (emphasis added.)

16

64. The SSA defined any data collected or developed as L-3's data: "'L-3 GS&ES Data' means <u>all information collected or developed by (i) L-3 GS&ES</u> or a L-3 GS&ES Affiliate regarding L-3 GS&ES Customers <u>or (ii) by Supplier</u> regarding L-3 GS&ES Customers (but only in their capacity as L-3 GS&ES Customers), including, under each of the clauses (i) and (ii) of this definition, business operations information, proprietary and competitive type information that may be valuable to competitors of either L-3 GS&ES or L-3 GS&ES' customers, accounting information, contractual information, inventory, products and/or serial numbers, all Customer personalization information, and or other raw or processed data in any form." <u>Id.</u> at ¶ 1.0 (emphasis added).

65. The SSA defined the customers as L-3's customers: "'L-3 GS&ES customer' means a customer of one or more services or products offered by L-3 GS&ES or an L-3 GS&ES affiliate." <u>Id.</u>

66. The SSA confirmed that L-3 retained ownership and control over the ACCOLADE system. The SSA expressly provided at paragraph 5.2 that "[b]oth parties understand that Supplier is acting in a supporting installation role under the direction of the overall L-3 GS&ES program office." Additionally, L-3 could terminate the SSA at any time for any reason by written notice, whereas IWT could only terminate if L-3 failed to make payments. <u>Id.</u> ¶¶ 5.4, 5.8.

67. As L-3's installer under the SSA, IWT visited L-3's customers' mines and physically installed the many components of the ACCOLADE system. IWT personnel sometimes wore uniforms that bore L-3's trademarked logo; used L-3's property, including property bearing L-3's trademarks; and represented themselves as working on L-3's behalf to install L-3's technology. IWT thus had unique access to L-3's customers and trademarked

17

property, and L-3's customers became accustomed to associating IWT personnel with L-3 and ACCOLADE.

68.     Paragraph 2.1 of the SSA, "Scope of Services," provides that "[t]his Agreement is for the provision of The Scope of Work as defined in Exhibit A and in accordance with the Installation Manual in Exhibit A-1."

69.     Exhibit A to the SSA "Statement of Work" provides in paragraph 1 that the objectives of the SSA were the "[i]nstallation of the ACCOLADE and other System in customer's mine."

70.     Paragraph 13.2 of the SSA, entitled "Exclusions," provides that no limitations of liability apply to claims under Section 12.

71.     Section 12.1 of the SSA provides that "[t]o the fullest extent permitted by law, Supplier [IWT] will indemnify, defend and hold harmless L-3 . . . from and against all claims, damages, losses, liabilities, costs, expenses, proceedings, suits, judgments and reasonable attorney's fees . . . arising out of or resulting from performance or non-performance of the Scope of Work . . . and (vii) resulting from any grossly negligent, willful misconduct or intentionally harmful act or omission of Supplier [IWT], its officers, agents, or employees."

72.     Thus, the SSA provides for IWT's unlimited liability for its breach, and that IWT is responsible for all of L-3's legal fees arising out of same.

73.     As set forth later herein, the installation by IWT of its own nodes in L-3's customers' mines is a breach of the SSA.

74.     On or about September 6, 2010, L-3 and IWT entered into a Purchase Order Agreement, PO 10DP0262. PO 10DP0262 provided for an "Attachment: 1) Statement of Work #005."

18

75.     Statement of Work #005 was and is an agreement which was denominated as "Work for Hire." Paragraph 8 of Statement of Work #005, entitled "Intellectual Property" provided that "IWT, by acceptance of this Order, assigns and agrees to assign and disclose all Intellectual Property developed in the performance of this Statement of Work. Any works of authorship developed under this Order in any form of expression including, without limitation, knowledge, techniques, know-how, manuals, products, and software, belong exclusively to [L-3] and will be transferred to [L-3]. If, by operation of law, the ownership of Developed Property does not automatically vest in [L-3], IWT must take sufficient steps, at IWT's expense, to assign ownership to [L-3]."

**IWT Secretly And Unlawfully Prepares
And Installs Competing Technology**

76.     On or about March 20, 2009, IWT filed Patent Application number "20120011365: Method and Apparatus for Reliable Communications in Underground and Hazardous Areas" pursuant to the Patent Cooperation Treaty (and which was subsequently filed with the US Patent and Trademark Office on January 12, 2012).

77.     IWT did not seek L-3's permission prior to filing Application #20120011365 nor did it name L-3 as a co-inventor on Application #20120011365.

78.     The invention covered in Application #20120011365 included L-3–owned intellectual property,

79.     Application #20120011365 failed to give credit to Dr. William Duff of L-3 who was a significant contributor to the invention.

80.     The claims in Application #201200111365 would be and are competing technology to the ACCOLADE system.

81.    On or about March 20, 2009, IWT filed Patent Application number

#20120008542: Distributed Ad Hoc Mesh Network Protocol for Underground Mine and

Hazardous Area Communications" pursuant to the Patent Cooperation Treaty (and which was

subsequently filed with the US Patent and Trademark Office on January 12, 2012).

82.    IWT did not seek L-3's permission prior to filing Application #20120008542, nor

did it name L-3 as a co-inventor on Application #20120008542.

83.    The invention covered in Application #20120008542 included L-3–owned

intellectual property,

84.    Application #20120008542 failed to give credit to Dr. William Duff of L-3 who

was a significant contributor to the invention.

85.    The claims in Application #20120008542 would be and are competing technology

to the ACCOLADE system.

86.    Despite agreements prohibiting IWT from preparing competing technology for

the underground-mining-communications market, in or about December 2010, IWT attended a

meeting at L-3 and presented L-3 with the prototype of a new handset—the existing handset was

manufactured by another of L-3's suppliers—as an alternative to the ACCOLADE system's

handset (the ACCOLADE handset is known as the MMR). In addition to its concern that IWT's

actions in developing another handset violated various agreements between it and IWT, L-3 was

concerned about marketing a new, untested product. L-3 has serious responsibilities to ensure

that its products meet and exceed safety requirements and do not cause any injuries to miners

engaged in extremely hazardous below-ground work. L-3 had and has built customer trust and

loyalty to its brands by fulfilling these obligations to every industry it serves, including the

United States Military. L-3 worried that IWT's device might not be sufficiently rugged for use in

underground coal mines. L-3 was additionally concerned that, since the IWT handset had not been tested or approved for use with the rest of the ACCOLADE system, it could potentially cause the rest of the system to fail and therefore jeopardize the safety of the miners employed by L-3's customers.

87.     IWT deliberately designed its "new" handset to resemble L-3's. Its handset includes the same preset text messages and user groups. Thus a user of IWT's handset could easily mistake it for L-3's.

88.     Despite L-3's opposition and in breach of the 2007 JDA, the 2008 JDA, and PO RC-00001, IWT began surreptitiously testing its handset to make it compatible with the ACCOLADE system to gain access to L-3's customers' mines and L-3's ACCOLADE system technology installed in those mines. IWT accomplished this surreptitious access by representing to L-3's customers that it was performing installation and maintenance work on behalf of L-3. IWT even at times may have worn L-3 uniforms or otherwise displayed L-3 trademarks on clothing and property to further convince customers that it was from L-3, while, in fact, it was attempting to develop competing technology that violated its agreements with L-3.

89.     For example, in May or June 2011, a miner at Sentinel Mine, one of L-3's customers and a mine where the ACCOLADE system had been tested, informed L-3 that an employee of IWT, Defendant Schmidt, had tested IWT's handset at the mine. The customer was confused and mistakenly believed that Schmidt was acting as part of the ACCOLADE team. Schmidt's and IWT's access to Sentinel Mine was made possible solely due to IWT's role as part of the ACCOLADE team.

90.     On another occasion, L-3's systems alerted it to an anomaly in an ACCOLADE system at one of its customer's mines. When L-3 contacted the mine to address the issue

remotely, L-3 was informed, "you already have someone here." That "someone" was an IWT employee testing its competing product without L-3's knowledge or permission.

91.     Even more alarmingly, IWT began installing its own handsets and nodes within L-3's ACCOLADE system, even though these products had never been tested with the system and thus posed the potential for life-threatening failure in the event of a mine accident. In or around September 2011, IWT brought a sample handset to Rosebud's TJS-6 Mine. Once again, in order to access the systems at L-3's customers' mines, IWT represented that it was performing installation of the trademarked ACCOLADE system on behalf of L-3.

92.     IWT's statements and conduct misled L-3's customers, who were accustomed to IWT's performance of installation and system maintenance for L-3. L-3 began receiving calls from confused customers who thought that IWT's handsets were L-3's. In or around May or June 2011, a representative of L-3's customer, Rosebud Mining, based in Pennsylvania, contacted L-3's sales staff about what the customer believed was L-3's new handset. The customer had been confused and mistakenly believed that the IWT handset was part of the ACCOLADE system. On another occasion, L-3's sales staff was contacted by one of its customers to purchase its "new" handset, which referred to IWT's competing (and unapproved) product. Other L-3 customers, such as Lone Mountain, have informed L-3 that they have seen the alternate handsets at their mines and have been confused as to its source and suitability for its purpose. Thereafter, IWT began openly marketing and selling its competing handsets. Because of L-3's leading position and sophisticated experience in the communications industry, IWT sought to use L-3's market reputation and customer loyalty to launch its own, competing technology. It therefore began advertising and marketing its products as L-3's.

93.     Around June 2011, the coal-mining industry held an annual trade fair in Pittsburgh, Pennsylvania. This trade fair is one of the largest and most well attended in the mining industry, with over 170 exhibiters and over 2,300 attendees. The fair draws attendees from throughout the United States and other countries and from every part of the mining industry. Vendors thus have access to thousands of national and international customers; this and similar trade fairs are a specific focus of L-3's efforts to solidify and increase its market share in the coal-mining industry.

94.     During the fair some IWT employees represented themselves as being from L-3. In other words, IWT employees represented that they were selling products from L-3's ACCOLADE system either as L-3 employees or as IWT subcontractors working for L-3. For example, without L-3's permission, an IWT employee, Steckley, surreptitiously signed into the show as an L-3 employee, used one of L-3's prepaid admissions, and wore an L-3 identification badge.

95.     Steckley and other IWT employees then advertised and marketed their handsets for sale at the trade fair. To promote their product to these thousands of potential customers, IWT employees circulated throughout the fair venue with their product and represented that they—and their products—were from L-3 or were part of the L-3 ACCOLADE system.

96.     In September 2011, IWT employees attended another trade fair, this time in Bluefield, West Virginia. This trade fair is also well known and well attended by national and international industry participants. Once again, to advertise and market their technology, IWT employees represented themselves under false pretenses that they and their products were from L-3 or were part of the L-3 ACCOLADE system.

97.     At or about the same point in time, without L-3's consent, Logi-Tec was passing out sample handsets that were not part of the ACCOLADE system, with the knowledge, consent and agreement of IWT. Upon information and belief, Logi-Tec represented these handsets as either L-3 handsets and/or as ACCOLADE handsets.

98.     Having successfully gained access to L-3's customers and technology and having begun to establish a customer base using L-3's reputation and professional goodwill, IWT launched its competing product.

99.     On October 11, 2011, L-3 attended the Mine Emergency Response Drill in Cumberland River, at one of L-3's customers' mines. A representative from Arch Coal was confused and had mistakenly believed that the system's portable mesh nodes being deployed were part of the ACCOLADE System. When that representative later learned that it was not an ACCOLADE product, he was surprised that the IWT handset worked with the L-3 system. On another evening, an employee of IWT, Schmidt, informed an L-3 employee that IWT intended to look for additional partners to help IWT sell its new, competing products for the coal-mining industry.

100.    In or about the first week of November 2011, IWT attended the Next Generation Mining Summit in Canada and represented itself as a competitor of L-3, offering its system as an alternative to L-3's ACCOLADE system.

101.    IWT currently openly markets its competing systems, including its SENTINEL system on its website. For example:

> Responding to the unique challenges of providing two-way communications and location capability in hazardous underground environments, IWT has developed the SENTINEL Communications and Tracking System. Leveraging IWT's field-proven mProv wireless mesh technology platform, the SENTINEL system has been specifically designed to meet the demanding

24

requirements of underground mining applications and is also applicable to first responder emergency communications, subway and utility subterranean networks and special military applications. The SENTINEL system is comprised of FMN Mesh Nodes, Gateways, Backup Battery systems, Handsets, tracking Beacons, Dispatch Worktation [sic], Portable Mesh Nodes for mine emergency operations, and Maintenance Tools.

High reliability communications is inherent to the self-healing, self-configuring SENTINEL system mesh network architecture by providing redundant communication paths from one device to another. In the event of any node failure the system automatically re-routes signals to another device within communication range. Quality of Service (QOS) voice communications, text messaging and tracking capability of personnel, equipment, or vehicles are supported over the network with one mesh radio. Data services for environmental sensors and machine state-of-health monitoring are also supported by the SENTINEL Underground Communications System.

Further information on all SENTINEL products this System contains:

FMN Mesh Node
Gateway
Battery Backup System
Handset
Beacon
mProv™ Mesh Management and Emplacement Tools

See *SENTINEL Communication and Tracking System*, Innovative Wireless Technologies,

http://www.iwtwireless.com/?page id=21 (last visited Feb. 22, 2012).

102.    IWT's competing handset contains L-3's intellectual property. Despite this fact,

upon information and belief, IWT has sought MSHA certification of its handset as its own

intellectual property.

103.    IWT's competing handset has caused and will continue to cause customer

confusion because it so closely resembles L-3's. Similarly, IWT has misled L-3's current and

potential customers that its competing nodes are part of the ACCOLADE system. It installed

those competing nodes in L-3's current and potential customers' mines, including but not limited

to the Bridger Mine in Wyoming and the Patriot Mine in West Virginia, without L-3's

knowledge or consent.

**Logi-Tec's Additional Acts in Helping IWT Unlawfully Promote**
**And Sell Its Competing Product**

104.    Logi-Tec was aware that L-3 and IWT teamed together to develop the

ACCOLADE system and that IWT was L-3's manufacturer and supplier for components of the

ACCOLADE system.

105.    Thereafter, Logi-Tec became IWT's new distributor and helped it promote and

sell its handsets.

106.    Nevertheless, after Logi-Tec began representing IWT, Logi-Tec falsely advised

L-3's customers that it would be selling L-3 products. In fact, Logi-Tec never was an agent of or

authorized representative for L-3. L-3's customers were confused and contacted L-3 to ask about

Logi-Tec now representing them.

107.    Like IWT, Logi-Tec told customers that it was selling products for L-3 that were

part of the ACCOLADE system. In truth, Logi-Tec distributed only IWT's competing product.

108.    Logi-Tec's misstatements confused L-3's customers, who then contacted L-3 to

ask about Logi-Tec's statements that it was selling L-3's products.

109.    On information and belief, Logi-Tec, like IWT, misled customers into believing

that Logi-Tec was associated with L-3 or its ACCOLADE system because it wanted to capitalize

on L-3's position as a leader in the communications industry.

**FIRST CAUSE OF ACTION AGAINST IWT**
**(Violations of Section 43(a) of the Lanham Act)**

110.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs

numbered "1" through "109" above as if more fully set forth herein.

111. IWT used marks belonging to L-3 to make false or misleading designations of the origins of its goods, in interstate commerce, in connection with the sale, offering for sale, distribution or advertising of IWT's goods.

112. IWT made false or misleading representations or descriptions of fact that were likely to and did confuse customers about the affiliation, connection or association of IWT's system with the ACCOLADE system or about the origin, sponsorship, or approval by L-3 of IWT's system. Calls from L-3's confused customers demonstrate the likelihood of confusion that IWT's misstatements caused.

113. IWT distributed commercial advertisements of its competing system(s) in interstate commerce. These advertisements included material false or misleading statements in commercial advertisements or promotions about the nature, characteristics, qualities, and origin of IWT's competing system(s). Those misstatements were made in interstate commerce and in connection with the sale, offering for sale, distribution or advertising of IWT's goods. The purpose of those false or misleading statements by IWT, a competitor of L-3, was to promote IWT's products in commerce and influence customers to buy IWT's goods. IWT's false or misleading representations were widely disseminated to customers in the relevant mining industries.

114. IWT's misleading advertisements and promotions tended to and did confuse customers about the affiliation, connection or association of IWT's system with the ACCOLADE system or about the origin, sponsorship, or approval by L-3 of IWT's system. Calls from L-3's confused customers demonstrate the actual confusion and likelihood of confusion that IWT's misstatements caused.

115.    L-3 was injured because customers who would otherwise have bought L-3's product bought IWT's product. IWT also injured the reputation and goodwill of L-3 by, among other things, installing unapproved nodes and handsets in the ACCOLADE system.

116.    All of the above allegations were in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), for which IWT is liable to L-3 for all of IWT's profits, L-3's damages proximately caused by IWT to L-3 in an amount to be proven at trial, and statutory damages.

117.    Wherefore, L-3 demands judgment against IWT in an amount to be proven at trial, but believed to be in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars ($118,840,000.00), as well as its reasonable costs and attorney's fees together with such other, further and different relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION AGAINST IWT**
**(Breach of Contract—2007 Joint Development Agreement; Injunction)**

118.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "117" above as if more fully set forth at length herein.

119.    Pursuant to the 2007 JDA and the rights granted to the parties concerning the use of FIP developed thereunder, L-3 was granted the "exclusive rights to the wireless mesh technology for voice communications application of the developed FIP (Exhibit B)" for use in underground coal mining applications.

120.    Pursuant to the 2007 JDA, IWT is precluded from preparing or marketing any products that compete with L-3's ACCOLADE system within the coal mining industry pursuant to paragraph 3.01(d) of the 2007 JDA: "IWT will not prepare competing technology to the expressed application for sale within the expressed Field of Use."

28

121.     IWT has interfered with L-3's exclusive rights to use the wireless mesh technology for voice communications application of the developed FIP (Exhibit B)" for use in underground coal mining applications.

122.     IWT has also prepared and marketed products that compete with the ACCOLADE system in underground coal mining applications.

123.     Pursuant to the 2007 JDA, IWT agreed that its violation of Paragraph 3.01(d) cannot be remedied by money damages, that L-3 would be entitled to an injunction, and that L-3 would not have to post a bond.

124.     By virtue of the conduct specified herein, and other acts as yet unknown to L-3, IWT has breached paragraph 3.01(d) of the 2007 JDA.

125.     Wherefore, IWT should be preliminarily and permanently enjoined from preparing or marketing any products competing with L-3 in the coal mining industry, and should be enjoined from using and/or exploiting any of the Foreground Intellectual Property ("FIP") developed thereunder, in violation of L-3's exclusive rights to use such property for use in underground coal mining applications, in connection with any of IWT's products, together with such other, further and different relief as the Court deems just and proper.

### THIRD CAUSE OF ACTION AGAINST IWT
### (Breach of Contract—2007 Joint Development Agreement; Money Damages)

126.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "125" above as if more fully set forth at length herein.

127.     Pursuant to the 2007 JDA and the rights granted to the parties concerning the use of FIP developed thereunder, L-3 was granted the "exclusive rights to the wireless mesh technology for voice communications application of the developed FIP (Exhibit B)" for use in underground coal mining applications.

128.     Pursuant to the 2007 JDA, IWT is precluded from preparing or marketing any products that compete with L-3's ACCOLADE system within the coal mining industry pursuant to Paragraph 3.01(d) of the 2007 JDA: "IWT will not prepare competing technology to the expressed application for sale within the expressed Field of Use."

129.     IWT has interfered with L-3's exclusive rights to use the wireless mesh technology for voice communications application of the developed FIP (Exhibit B)" for use in underground coal mining applications.

130.     IWT has also prepared and marketed products that compete with the ACCOLADE system in underground coal mining applications.

131.     By virtue of the conduct specified herein, and other acts as yet unknown to L-3, IWT has breached Paragraph 3.01(d) of the 2007 JDA.

132.     The 2007 JDA was later modified by subsequent Purchase Order Agreement No. 71GD070008, Change Order No. 5.

133.     IWT's unlawful acts have damaged and will continue to damage L-3 in an amount to be proven at trial.

134.     Wherefore, L-3 demands a judgment against IWT for direct damages in an amount without limitation to be proven at trial, together with such other, further and different relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION AGAINST IWT**
**(Breach of Contract 2007 Joint Development Agreement:**
**<u>Specific Performance</u>)**

135.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "134" above as if more fully set forth at length herein.

136.     Section 3.01(b) of the 2007 JDA provides that IWT "will" enter into a licensing

agreement with L-3 for the use of all Background Intellectual Property. IWT has failed to enter into such agreement.

137.    IWT filed inaccurate patent applications 20120011365 and 20120008542, respectively, without L-3's knowledge or consent.

138.    IWT did not list any employees of L-3 as inventors and/or co-inventors on those applications, even though L-3 employees were involved in the development of and helped invent the technology described in such applications.

139.    IWT did not list L-3 as an assignee and/or co-owner on any patents that might issue from those applications, although required to do so as a result of the various agreements between the parties.

140.    Accordingly, L-3 demands judgment that IWT be required to enter into such licensing agreement with respect to any Intellectual Property contained in the ACCOLADE system with respect to which IWT claims that such Intellectual Property is Background Intellectual Property, on reasonable terms and conditions and providing for a reasonable royalty, and directing that IWT name the appropriate employees of L-3 as co-inventors, on such applications, and/or that they file an assignment of any patents granted with respect to such applications, naming L-3 as a co-owner of such patents, together with such other, further and different relief as the Court deems just and proper.

**FIFTH CAUSE OF ACTION AGAINST IWT**
**(Breach of Contract 2007 Joint Development Agreement;**
**Declaratory Judgment)**

141.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "140" above as if more fully set forth at length herein.

142.    Section 3.01(b) of the 2007 JDA provides that IWT "will" enter into a licensing

agreement with L-3 for the use of all Background Intellectual Property. IWT has failed to enter into such agreement.

143.    IWT filed inaccurate patent applications 20120011365 and 20120008542, respectively without L-3's knowledge or consent.

144.    IWT did not list any employees of L-3 as inventors and/or co-inventors on those applications, even though L-3 employees were involved in the development of and helped invent the technology described in such applications.

145.    IWT did not list L-3 as an assignee and/or co-owner on any patents that might issue from those applications, although required to do so as a result of the various agreements between the parties.

146.    Wherefore, pursuant to Virginia Code § 8.01-184, L-3 demands a declaratory judgment from this Court that IWT be required to enter into such agreement with respect to any Intellectual Property contained in the ACCOLADE system with respect to which IWT claims such Intellectual Property is Background Intellectual Property, on reasonable terms and conditions and providing for a reasonable royalty, and that IWT must name the appropriate employees of L-3 as co-inventors on such applications, and/or that they file an assignment of any patents granted with respect to such applications naming L-3 as a co-owner of such patents, together with such other, further and different relief as the Court deems just and proper.

**SIXTH CAUSE OF ACTION AGAINST IWT**
**(Breach of Contract - Purchase Order Agreement No. 71GD070008,**
**Change Order No. 5; Money Damages)**

147.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "146" above, as if more fully set forth at length herein

148.     The Purchase Order Agreement incorporated the Subcontract and modified the

2007 JDA. The Subcontract incorporated the Teaming Agreement by reference.

149.     As set forth above and incorporated by reference, IWT has breached Purchase

Order Agreement No. 71GD07008, Change Order No. 5.

150.     Wherefore, L-3 demands a judgment against IWT for direct damages in an

amount without limitation to be proven at trial, together with such other, further and different

relief as the Court deems just and proper.

**SEVENTH CAUSE OF ACTION AGAINST IWT**
**(Breach of Contract—2008 Joint Development Agreement; Injunction)**

151.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs

numbered "1" through "150" above as if more fully set forth at length herein.

152.     Pursuant to the 2008 JDA, IWT is precluded from preparing or marketing any

products competing with L-3's ACCOLADE system within the coal-mining industry pursuant to

paragraph 3.01(d): "IWT will not prepare competing technology to the expressed application for

sale within the expressed Field of Use."

153.     IWT has prepared and marketed products that compete with the ACCOLADE

system in the underground coal mining applications.

154.     Pursuant to the 2008 JDA, IWT agreed that its violation of Paragraph 3.01(d)

cannot be remedied by money damages, that L-3 would be entitled to an injunction, and that L-3

would not have to post a bond.

155.     By virtue of the conduct specified herein, and other acts as yet unknown to L-3

IWT has breached paragraph 3.01(d) of the 2008 JDA.

156.     Wherefore, IWT should be preliminarily and permanently enjoined from

preparing or marketing any products competing with L-3 in the coal mining industry, and should

33

be enjoined from using and/or exploiting any of the FIP developed thereunder, in violation of L-3's exclusive rights to use such property for use in the underground coal mining applications, in connection with any of IWT's products together with such other, further and different relief as the Court deems just and proper.

## EIGHTH CAUSE OF ACTION AGAINST IWT
### (Breach of Contract—2008 Joint Development Agreement; Money Damages)

157.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "156" above as if more fully set forth at length herein.

158.    Pursuant to the 2008 JDA, and the rights granted to the parties concerning the use of FIP developed thereunder, IWT is precluded from preparing or marketing any products competing with L-3's ACCOLADE system within the coal mining industry pursuant to paragraph 3.01(d): "IWT will not prepare competing technology to the expressed application for sale within the expressed Field of Use."

159.    IWT has prepared and marketed products that compete with the ACCOLADE system in the underground coal mining applications.

160.    By virtue of the conduct specified herein, and other acts as yet unknown to L-3, IWT has breached paragraph 3.01(d) of the 2008 JDA.

161.    The 2008 JDA was later modified by being incorporated by reference into PO RC-00001, such that there is no limitation of liability or damages as to IWT's acts.

162.    IWT's unlawful acts have damaged and will continue to damage L-3 in an amount to be proven at trial that includes without limitation indirect, consequential, and incidental damages.

163.    Wherefore, L-3 demands a judgment against IWT in an amount to be proven at trial, in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars

($118,840,000.00) together with such other, further and different relief as the Court deems just and proper.

## NINTH CAUSE OF ACTION AGAISNT IWT
### (Breach of Contract – 2008 Joint Development Agreement; Specific Performance)

164.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "163" above, as if more fully set forth at length herein.

165.    IWT has failed to turn over to L-3 all the technology that was jointly developed by IWT and L-3, as set forth earlier herein, including any and all updates.

166.    L -3 has an ownership interest in the technology that was jointly developed by IWT and L-3, and/or is considered open source technology including any and all updates.

167.    IWT filed inaccurate patent applications 20120011365 and 20120008542, respectively, without L-3's knowledge or consent.

168.    IWT did not list any employees of L-3 as inventors and/or co-inventors on those applications, even though L-3 employees were involved in the development of and helped invent the technology described in such applications.

169.    IWT did not list L-3 as an assignee and/or co-owner on any patents that might issue from those applications, although required to do so as a result of the various agreements between the parties.

170.    L-3 may not have an adequate remedy at law.

171.    Wherefore, L-3 demands an order from this Court that IWT must turn over any and all technology that was jointly developed by IWT and L-3 and/or is described as open source technology, including any updates and directing that IWT name the appropriate employees of L-3 as co-inventors, on such applications, and/or that they file an assignment of any patents granted

35

with respect to such applications, naming L-3 as a co-owner of such patents, together with such other, further and different relief as the Court deems just and proper.

## TENTH CAUSE OF ACTION AGAISNT IWT
### (Breach of Contract – 2008 Joint Development Agreement; Declaratory Judgment)

172.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "171" above, as if more fully set forth at length herein.

173.    IWT has failed to turn over to L-3 all the technology that was jointly developed by IWT and L-3 and/or is open source technology, as set forth earlier herein, including any and all updates.

174.    IWT filed inaccurate patent applications 20120011365 and 20120008542, respectively, without L-3's knowledge or consent.

175.    IWT did not list any employees of L-3 as inventors and/or co-inventors on those applications, even though L-3 employees were involved in the development of and helped invent the technology described in such applications.

176.    IWT did not list L-3 as an assignee and/or co-owner on any patents that might issue from those applications, although required to do so as a result of the various agreements between the parties.

177.    Wherefore, pursuant to Virginia Code § 8.01-184, L-3 demands a declaratory judgment from this Court that L-3 has an ownership interest in the technology that was jointly developed by IWT and L-3 and/or is open source technology and that IWT must turn over any and all technology that was jointly developed by IWT and L-3 and/or is open source technology including any updates, and that IWT must name the appropriate employees of L-3 as co-inventors on such applications, and/or that they file an assignment of any patents granted with

respect to such applications naming L-3 as a co-owner of such patents, together with such other, further and different relief as the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION AGAINST IWT
### (Breach of Contract - Purchase Order RC-00001; Money Damages)

178.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "177" above, as if more fully set forth at length herein

179.     Purchase Order RC-00001 specifically incorporated the 2008 JDA by reference. Accordingly, a breach of the 2008 JDA also constitutes a breach of the aforementioned purchase order agreement.

180.     As set forth above and incorporated by reference, IWT has breached the 2008 JDA.

181.     Wherefore, L-3 demands money damages in an amount of to be proven at trial, but believed to be in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars ($118,840,000.00) together with such other, further and different relief as the Court deems just and proper.

### TWELFTH CAUSE OF ACTION AGAINST IWT
### (Breach of Contract - Purchase Order RC-00001; Specific Performance)

182.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "181" above, as if more fully set forth at length herein

183.     Purchase Order RC-00001 specifically incorporated the 2008 JDA by reference.

184.     Accordingly, a breach of the 2008 JDA which also constitutes a breach of the aforementioned purchase order.

185.     As set forth above and incorporated by reference, IWT has breached the 2008 JDA.

5231351

186.     IWT filed inaccurate patent applications 20120011365 and 20120008542,

respectively, without L-3's knowledge or consent.

187.     IWT did not list any employees of L-3 as inventors and/or co-inventors on those

applications, even though L-3 employees were involved in the development of and helped invent

the technology described in such applications.

188.     IWT did not list L-3 as an assignee and/or co-owner on any patents that might

issue from those applications, although required to do so as a result of the various agreements

between the parties.

189.     L-3 may not have an adequate remedy at law.

190.     Wherefore, L-3 demands an order from this Court that IWT must turn over any

and all technology that was jointly developed by IWT and L-3 and/or is described as open source

technology, including any updates and directing that IWT name the appropriate employees of L-

3 as co-inventors, on such applications, and/or that they file an assignment of any patents granted

with respect to such applications, naming L-3 as a co-owner of such patents, together with such

other, further and different relief as the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION AGAINST IWT
### (Breach of Contract - Purchase Order RC-00001; Declaratory Judgment)

191.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs

numbered "1" through "190" above, as if more fully set forth at length herein

192.     Purchase Order RC-00001 specifically incorporated the 2008 JDA by reference.

193.     Accordingly, a breach of the 2008 JDA also constitutes a breach of the

aforementioned purchase order.

194.     As set forth above and incorporated by reference, IWT has breached the 2008

JDA.

195.     Wherefore, pursuant to Virginia Code § 8.01-184, L-3 demands a declaratory judgment from this Court that L-3 has an ownership interest in the technology that was jointly developed by IWT and L-3 and/or is open source technology and that IWT must turn over any and all technology that was jointly developed by IWT and L-3 and/or is open source technology including any updates, and that IWT must name the appropriate employees of L-3 as co-inventors on such applications, and/or that they file an assignment of any patents granted with respect to such applications naming L-3 as a co-owner of such patents, together with such other, further and different relief as the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
### (Breach of Contract - Purchase Order RC-00001; Money Damages; Indemnification)

196.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "195" above, as if more fully set forth at length herein

197.     Paragraph 20 of the purchase order agreement further provides that IWT shall indemnify and hold harmless L-3 "against all claims, liabilities, damages, losses, and expenses, including attorneys' fees and costs or suits arising out of <u>or in any way connected with the Goods or Services provided under this Agreement, including, without limitation . . . (iv) any claim based on the negligence, omissions or willful misconduct of [IWT]." (emphasis added).</u>

198.     IWT's actions, as described above, arise out of, are connected with the goods or services provided under the agreement, and/or constitute negligence, omissions, and/or willful misconduct.

199.     Paragraph 20 of the aforementioned Purchase Order Agreement specifically provides that in the event of any claim brought against IWT by L-3 arising out of the negligence,

omissions, or willful misconduct of IWT, that IWT agreed to pay or reimburse all costs that may be incurred by L-3 in enforcing this indemnity, including attorneys' fees.

200. As a result of the foregoing, L-3 has been damaged and demands a judgment by way of indemnification for all of its legal fees incurred in connection with this suit.

## FIFTEENTH CAUSE OF ACTION AGAINST IWT
### (Breach of Contract— Service Support Agreement; Money Damages)

201. Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "200" above, as if more fully set forth at length herein.

202. IWT is precluded from delivering and installing components of its own system, instead of L-3's system, pursuant to the Service Support Agreement.

203. Paragraph 12.1 of the SSA provided that, "[t]o the fullest extent permitted by law, Supplier [IWT] will indemnify, defend and hold harmless L-3 . . . from and against all claims, damages, losses, liabilities, costs, expenses, proceedings, suits, judgments and reasonable attorney's fees . . . arising out of or resulting from performance or non-performance of the Scope of Work . . . and (vii) resulting from any grossly negligent, willful misconduct or intentionally harmful act or omission of Supplier [IWT], its officers, agents or employees." (emphasis added).

204. That such breach provides under Sections 12 and 13.2 for unlimited liability to IWT arising from such breach.

205. IWT's foregoing described delivery and installation of its own components and system instead of L-3's components and system constituted a breach of the Service Support Agreement.

206. IWT's willful solicitation of L-3's customers and installation and delivery of IWT's components in L-3's customers mines will damage L-3 in an amount to be proven at trial,

but believed to be in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars ($118,840,000.00).

207.    Wherefore, L-3 demands a judgment against IWT in an amount to be proven at trial, in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars ($118,840,000.00), together with such other, further and different relief as the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### (Indemnification)

208.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "207" above, as if more fully set forth at length herein

209.    Section 12.1 of the SSA provided that "[t]o the fullest extent permitted by law, Supplier [IWT] will indemnify, defend and hold harmless L-3 . . . from and against all claims, damages, losses, liabilities, costs, expenses, proceedings, suits, judgments and <u>reasonable attorney's fees</u> . . . arising out of or resulting from performance or non-performance of the Scope of Work . . . and (vii) resulting from any grossly negligent, willful misconduct or intentionally harmful act or omission of Supplier [IWT], its officers, agents or employees." (emphasis added).

210.    IWT's actions, as described above, concern performance, constitute nonperformance, as well as constitute negligence, omissions, and/or willful misconduct.

211.    As a result of the foregoing, L-3 has been damaged and demands a judgment by way of indemnification for all of its legal fees incurred in connection with this suit.

212.    Wherefore, L-3 demands a judgment in an amount to be proven at trial together with such other, further and different relief as the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION AGAINST IWT
### (Breach of the Implied Covenant of Good Faith and Fair Dealing – Service Support Agreement; Money Damages)

213. Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "212" above, as if more fully set forth at length herein.

214. Every contract contains an implied covenant of good faith and fair dealing in the performance of the agreement.

215. IWT has breached the implied covenant of good faith and fair dealing in its performance of the Service Support Agreement.

216. IWT's delivery and installation of its own components in L-3's customers' mines and solicitation of L-3's customers is a breach of the implied covenant of good faith and fair dealing in IWT's performance of the Service Support Agreement and will cause L-3 to incur damages in an amount to be proven at trial.

217. Wherefore, L-3 demands a judgment against IWT in an amount to be proven at trial, in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars ($118,840,000.00) together with such other, further and different relief as the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION AGAINST IWT
### (Actual Fraud)

218. Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "217" above as if more fully set forth herein.

219. The 2008 JDA provides that "IWT will not prepare competing technology to the expressed application for sale within the expressed Field of Use [underground coal mining applications]." 2008 JDA ¶ 3.01(d).

5231351

220. The terms of the 2008 JDA were amended by a Change Order to the Purchase Order for the 2008 JDA, executed by the parties, to extend the period of performance for the 2008 JDA to March 15, 2009.

221. The clear intent of IWT, in executing these agreements, was to convince and persuade Plaintiff that IWT intended to provide services to Plaintiff and, to the extent that it developed technology independent of that developed by Plaintiff, to not use such technology to compete with L-3 with respect to underground coal mining applications.

222. Upon information and belief, IWT well knew at the time it entered into the 2008 JDA and PO RC-00001 that its representations about its performance were false because on or about March 20, 2009, IWT filed Patent Applications 20120011365 and 20120008542, both of which applications embodied technology that was developed under the 2008 JDA and PO RC-00001 and was intended to be part of the ACCOLADE system, and both applications were specifically intended for use in underground coal mining applications.

223. In order for IWT to be able to file its patent applications merely 5 days after the period of performance of the 2008 JDA and PO RC-00001, IWT had to have been preparing competing technology during the term of part of the 2008 JDA and PO RC-00001.

224. Upon information and belief, based upon the conduct engaged in by Defendant IWT as set forth above, and the proximity in time between the above-described agreements and the filing of Patent Applications 20120011365 and 20120008542, it was the intention of Defendant IWT to never perform under the 2008 JDA to PO RC-00001. Defendant IWT knowingly and intentionally made the false representations embodied in the agreements as set forth above.

225. The false representations made by Defendant IWT were material and were intended to mislead and in fact misled Plaintiff.

226. The false representations made by Defendant were justifiably relied upon by Plaintiff.

227. By virtue of such reliance upon false representations made by Defendant IWT, Plaintiff has incurred damages in an amount unknown to Plaintiff at this time, but believed to be in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars ($118,840,000.00)

228. Wherefore, L-3 demands money damages in an amount of to be proven at trial, in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars ($118,840,000.00), together with such other, further and different relief as the Court deems just and proper.

### NINETEENTH CAUSE OF ACTION AGAINST IWT, HANSEN, CARRIER, SCHMIDT, STECKLEY, PASSMORE, KREEGER AND JARRETT
#### (Tortious Interference With Business Expectancy)

229. Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "228" above as if more fully set forth at length herein.

230. L-3 had sold and installed the ACCOLADE system to coal mining companies throughout the United States, as set forth above.

231. Specifically, L-3 had sold and installed the ACCOLADE system at coal mines owned and/or operated by, among other companies, Arch Coal, Inc. and Rosebud Mining Co.

232. The Lone Mountain Mine, operated by Arch Coal, Inc., is located in part within the Commonwealth of Virginia.

233.     L-3 had a business expectancy to engage distributors to sell the ACCOLADE system, to market that system to new customers, as well as to existing customers such as Arch Coal, Inc. and Rosebud Mining Co., directly to maintain and improve its market share. It was probable that L-3 would continue deriving an economic benefit from its ACCOLADE system.

234.     L-3 had a legitimate expectation that, based upon the successful operation of the ACCOLADE system in mines operated by its customers, it would be successful in its business plan to sell and install the ACCOLADE system in other mines owned by those customers, as well as mines owned and operated by new customers.

235.     IWT, Hansen, Carrier, Schmidt, Steckley, Passmore, Kreeger and Jarrett knew of L-3's business expectancy. There was a reasonable certainty that, absent IWT's, Hansen's, Carrier's, Schmidt's, Steckley's, Passmore's, Kreeger's and Jarrett's tortious conduct, L-3 would have realized its business expectancy.

236.     IWT, Hansen, Carrier, Schmidt, Steckley, Passmore, Kreeger and Jarrett used improper means to interfere with L-3's business expectancy, including misrepresentation and deceit, misuse of confidential or proprietary information, and unethical behavior, as set forth above.

237.     IWT's conduct alleged herein was willful, wanton and intentional and engaged in with reckless disregard of L-3's rights and therefore L-3 is entitled to an award of punitive damages in consequence of IWT's wrongful conduct.

238.     L-3 has been damaged by virtue of IWT's, Hansen's, Carrier's, Schmidt's, Steckley's, Passmore's, Kreeger's and Jarrett's conduct as set forth herein which constitutes tortious interference with L-3's expectancy in an amount to be proven at trial.

5231351

239.     Wherefore, L-3 demands a judgment against IWT, Hansen, Carrier, Schmidt, Steckley, Passmore, Kreeger and Jarrett in an amount to be proven at trial, in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars ($118,840,000.00) together with such other, further and different relief as the Court deems just and proper.

## TWENTIETH CAUSE OF ACTION AGAINST IWT, HANSEN, CARRIER, SCHMIDT, STECKLEY, PASSMORE, KREEGER AND JARRETT
### (Unfair Business Practices)

240.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "239" above as if more fully set forth at length herein.

241.     IWT, Hansen, Carrier, Schmidt, Steckley, Passmore, Kreeger and Jarrett engaged in unfair business practices against L-3 by procuring and/or attempting to procure L-3's customers and misusing L-3's intellectual property.

242.     IWT, Hansen, Carrier, Schmidt, Steckley, Passmore, Kreeger and Jarrett engaged in unfair business practices against the L-3 by:

a.     Misrepresenting themselves and/or IWT and/or IWT's employees and/or agents as L-3's employees and/or agents to gain access to L-3's customers and/or misappropriate L-3's goodwill;

b.     Misrepresenting to L-3's customers that IWT's new handset was part of L-3's ACCOLADE system in an attempt to cause customer confusion and misappropriate L-3's goodwill; and

c.     Misrepresenting to L-3's customer that IWT's node was part of L-3's ACCOLADE system in an attempt to cause customer confusion and misappropriate L-3's goodwill.

243.     IWT engaged in unfair trade practices against L-3 by applying for and/or attempting to apply for MSHA certification of products containing L-3's intellectual property.

244.     IWT engaged in unfair trade practices against the L-3 by misrepresenting the nature and origin of its handset including by misrepresenting that it had ownership rights in the handset, that it had ownership rights in the intellectual property in the handset, and that its handset did not contain L-3 intellectual property.

245.     The acts set forth above were conducted by unlawful means, including fraud, and/or were engaged in without justifiable cause.

246.     IWT's products and its conduct when marketing those products are likely to confuse consumers, and have already confused consumers, about whether the products are L-3's.

247.     Customers who were confused otherwise would have purchased L-3's system.

248.     The acts set forth above, as well as other acts yet to be discovered, constitute unfair business practices.

249.     As a result of the foregoing, L-3 has been damaged, continues to be damaged and demands judgment in an amount unknown at this time, but believed to be in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars ($118,840,000.00).

250.     Furthermore, the conduct of IWT, Hansen, Carrier, Schmidt Steckley, Passmore, Kreeger and Jarrett was willful, wanton, and intentional and done in reckless disregard of L-3's rights and therefore L-3 demands punitive damages as a result of their unfair business practices.

251.     Wherefore, L-3 demands a judgment against IWT, Hansen, Carrier, Schmidt, Steckley, Passmore, Kreeger and Jarrett in an amount to be proven at trial, but believed to be in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars

($118,840,000.00) together with such other, further and different relief as the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION AGAINST IWT AND LOGI-TEC
### (Virginia Business Conspiracy)

252.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "251" above as if more fully set forth at length herein.

253.    IWT combined and acted together with its distributor Logi-Tec for the purpose of willfully and maliciously injuring L-3 in its reputation, trade and business within the meaning of Virginia Code § 18.2-499 and 500, which renders IWT and Logi-Tec liable for treble damages in excess of Three Hundred Fifty-Six Million Five Hundred Twenty Thousand Dollars ($356,520,000.00), in an amount to be proven at trial, together with reasonable attorney's fees.

254.    IWT and Logi-Tec injured L-3's business and reputation for improper purposes including but not limited to tortiously interfering with L-3's expected business and other improper aims yet to be discovered.

255.    IWT and its distributor Logi-Tec are separate and distinct and each had a separate, independent, and identifiable personal stake in the outcome of the foregoing conspiracy.

256.    IWT and Logi-Tec combined to injure L-3's business and reputation, including by deceptively accessing L-3's customers, deceptively promoting IWT's competing products, and misappropriating and misusing L-3's intellectual property, as well as by distributing IWT's products to L-3's customers' mines, targeting L-3's customers with advertising of IWT's products, and by other acts as yet to be discovered.

257.    L-3's reputation, business and trade have been damaged by such business conspiracy.

258.    The conduct of IWT and Logi-Tec alleged herein was done with an unlawful purpose and used unlawful means.

259.    The conduct of IWT and Logi-Tec alleged herein was willful, wanton and intentional and done in reckless disregard of L-3's rights and therefore L-3 is entitled to an award of punitive damages in consequence of IWT's and Logi-Tec's wrongful conduct.

260.    Wherefore, L-3 demands a judgment against IWT and Logi-Tec in an amount to be proven at trial, but believed to be in excess of Three Hundred Fifty-Six Million Five Hundred Twenty Thousand Dollars ($356,520,000.00), together with reasonable attorney's fees and such other, further and different relief as the Court deems just and proper.

### TWENTY-SECOND CAUSE OF ACTION AGAINST IWT AND LOGI-TEC
### (Common-Law Conspiracy)

261.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "260" above, as if more fully set forth at length herein.

262.    IWT combined and acted together with its distributor Logi-Tec for the purpose of breaching the agreements between the parties, interfering with L-3 's contracts and business expectancies, misusing L-3's intellectual property and to otherwise harm L-3 in its business or property without any justification whatsoever, and unjustly to enrich themselves at the expense of L-3.

263.    IWT and its distributor Logi-Tec are separate and distinct and each had a separate and independent, identifiable personal stake in the outcome of the foregoing conspiracy.

264.    The conduct of IWT and Logi-Tec alleged herein was tortious, including but not limited to, as described above, their use of deceptive trade practices and unfair competition to further the aims of the conspiracy.

265.    The conspiracy alleged herein caused reasonably foreseeable direct and consequential damages to L-3, in an amount to be proven at trial.

266.    The conduct of IWT and Logi-Tec alleged herein was willful, wanton and intentional and done in reckless disregard of L-3's rights and therefore L-3 is entitled to an award of punitive damages in consequence of IWT's and Logi-Tec's wrongful conduct.

267.    Wherefore, L-3 demands a judgment against IWT and Logi-Tec in an amount to be proven at trial, but believed to be in excess of One Hundred Eighteen Million Eight Hundred Forty Thousand Dollars ($118,840,000.00) together with such other, further and different relief as the Court deems just and proper.

Together with such other, further and different relief as the Court deems just and proper.

Dated: April 11, 2012

By:    /s/ Benjamin G. Chew
Benjamin G. Chew (Va. Bar # 29113)
Nigel L. Wilkinson (Va. Bar. # 46500)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC  20037
Tel.: (202) 457-6000
Email:bchew@pattonboggs.com

Mark T. Stancil (Va. Bar #44572)
Deneen J. Melander (Va. Bar #27445)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street N.W., Suite 411
Washington, DC 20006
Tel.: (202) 775-4520
E-mail: mstancil@robbinsrussel.com

Steven L. Levitt
Jennifer Ann Wynne
STEVEN L. LEVITT & ASSOCIATES P.C.
129 Front Street
Mineola, NY 11501
Tel.: (516) 248-9700

E-mail: slevitt@sllpc.com
*(admitted pro hac vice)*

**COUNSEL FOR PLAINTIFF**

Plaintiff's Address:

L-3 NATIONAL SECURITY SOLUTIONS, INC.,
AS SUCCESSOR TO L-3 SERVICES, INC.
GLOBAL SECURITY & ENGINEERING SOLUTIONS DIVISION
3750 Centerview Drive
Chantilly, VA 20151

# CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of March, 2012, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

Joshua F.P. Long
Woods Rogers PLC
10 S. Jefferson Street, Suite 1400
P.O. Box 14125
Roanoke, VA 24038-4125
*Counsel for IWT Defendants*

J. Barrett Lucy
Freeman Dunn Alexander Tiller Gay & Lucy, PC
1045 Cottontown Road
Lynchburg, VA 24503
*Counsel for Rod Passmore*

Attison L. Barnes, III
Benjamin J. Kohr
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
*Counsel for Logi-Tec, Inc.*

R. Mark Dare
Isler Dare Ray Radcliffe & Connolly, P.C.
1919 Gallows Road, Suite 320
Vienna, VA 22182
*Counsel for Bookcliff Sales, Inc.*

/s/ Benjamin G. Chew
Benjamin G. Chew (Va. Bar # 29113)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC  20037
Tel.: (202) 457-6000
Email:bchew@pattonboggs.com